Loren R. COUSINEAU and Marilyn J. Cousineau, Wayne F. Cousineau and Diane B. Cousineau, Curtis E. Dahl and Bonnie L. Dahl, Appellants,

v.

Devon A. WALKER and Joan Walker, Appellees.

No. 4551.

Supreme Court of Alaska.

June 27, 1980.

 

Dennis M. Mestas, Mestas & Schneider, Anchorage, for appellants.

John W. Sivertsen, Jr., and Terry C. Aglietti, Aglietti, Offret & Pennington, Anchorage, for appellees.

Before RABINOWITZ, C. J.; and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

## OPINION

BOOCHEVER, Justice.

The question in this case is whether the appellants are entitled to rescission of a land sale contract because of false statements made by the sellers. The superior court concluded that the buyers did not rely on any misrepresentations made by the sellers, that the misrepresentations were not material to the transaction, and that reliance by the buyers was not justified. Restitution of money paid under the contract was denied. We reverse and remand the case to the superior court to determine the amount of damages owed the appellants.

In 1975, Devon Walker and his wife purchased 9.1 acres of land in Eagle River, Alaska, known as Lot 1, Cross Estates. They paid $140,000.00 for it. A little over a year later, in October, 1976, they signed a multiple listing agreement with Pat Davis, an Anchorage realtor. The listing stated that the property had 580 feet of highway frontage on the Old Glenn Highway and that "ENGINEER REPORT SAYS OVER 1 MILLION IN GRAVEL ON PROP." The asking price was $245,000.00.

When the multiple listing expired, Walker signed a new agreement to retain Davis as an exclusive agent. In the broker's contract, the property was again described as having 580 feet of highway frontage, but the gravel content was listed as "minimum 80,000 cubic yds of gravel." The agreement also stated that 2.6 acres on the front of the parcel had been proposed for B–3 zoning (a commercial use), and the asking price was raised to $470,000.00.

An appraisal was prepared to determine the property's value as of December 31,

1976. Walker specifically instructed the appraiser not to include the value of gravel in the appraisal. A rough draft of the appraisal and the appraiser's notes were introduced at trial. Under the heading, "Assumptions and Limiting Conditions," the report stated the appraisal "does not take into account any gravel . . . ." But later in the report the ground was described as "all good gravel base . . . covered with birch and spruce trees." The report did not mention the highway footage of the lot.

Wayne Cousineau, a contractor who was also in the gravel extraction business, became aware of the property when he saw the multiple listing. He consulted Camille Davis, another Anchorage realtor, to see if the property was available. In January, Cousineau and Camille Davis visited the property and discussed gravel extraction with Walker, although according to Walker's testimony commercial extraction was not considered. About this time Cousineau offered Walker $360,000.00 for the property. Cousineau tendered a proposed sales agreement which stated that all gravel rights would be granted to the purchaser at closing.

Sometime after his first offer, Cousineau attempted to determine the lot's road frontage. The property was covered with snow, and he found only one boundary marker. At trial the appraiser testified he could not find any markers. Cousineau testified that he went to the borough office to determine if any regulations prevented gravel extraction.

Despite Walker's reference to an "Engineer Report" allegedly showing "over 1 million in gravel," Walker admitted at trial that he had never seen a copy of the report. According to Walker's agent, Pat Davis, Camille Davis was told that if either she or Cousineau wanted the report they would have to pay for it themselves. It was undisputed that Cousineau never obtained the report.

In February, 1977, the parties agreed on a purchase price of $385,000.00 and signed an earnest money agreement. The sale was contingent upon approval of the zoning change of the front portion of the lot to commercial use. The amount of highway frontage was not included in the agreement. Paragraph 4(e) of the agreement conditionally granted gravel rights to Cousineau.[1] According to the agreement, Cousineau would be entitled to remove only so much gravel as was necessary to establish a construction grade on the commercial portion of the property. To remove additional gravel, Cousineau would be required to pay releases on those portions of ground where gravel was removed. This language was used to prevent Walker's security interest in the property from being impaired before he was fully paid.

Soon after the earnest money agreement was signed, the front portion of the property was rezoned and a month later the parties closed the sale.

There is no reference to the amount of highway frontage in the final purchase agreement. An addendum to a third deed of trust incorporates essentially the same language as the earnest money agreement with regard to the release of gravel rights.

After closing, Cousineau and his partners began developing the commercial portion of the property. They bought a gravel scale for $12,000.00 and used two of Cousineau's trucks and a loader. The partners contracted with South Construction to remove the gravel. According to Cousineau's testimony, he first learned of discrepancies in the real estate listing which described the lot when a neighbor threatened to sue Cousineau because he was removing gravel from the neighbor's adjacent lot. A recent survey shows that there is 415 feet of highway frontage on the property—not 580 feet, as advertised.

1. Paragraph IX of the judge's factual findings states that there was no mention of the amount of gravel or road frontage in the purchase agreement. This statement is correct insofar as the agreement did not mention specific amounts of gravel or frontage, but the agreement plainly does provide for the transfer of gravel rights.

At the same time Cousineau discovered the shortage in highway frontage, South Construction ran out of gravel. They had removed 6,000 cubic yards. To determine if there was any more gravel on the property, a South Construction employee bulldozed a trench about fifty feet long and twenty feet deep. There was no gravel. A soils report prepared in 1978 confirmed that there were no gravel deposits on the property.

After December, 1977, Cousineau and his partners stopped making monthly payments. At that time they had paid a total of $99,000.00 for the property, including a down payment and monthly installments. In March, 1978, they informed Walker of their intention to rescind the contract. A deed of trust foreclosure sale was held in the fall of 1978, and Walker reacquired the property. At a bench trial in December, Cousineau and his partners were denied rescission and restitution.

Among his written findings of fact, the trial judge found:

> At some point in time, between October 24, 1976, and January 11, 1977, there existed a multiple listing advertisement which included information relating to gravel as well as road frontage, said information subsequently determined to be incorrect.

He further found:

> The plaintiffs did not rely on any misinformation or misrepresentations of de-

fendants. The claimed misinformation about gravel on the property and the road frontage was not a material element of the parties' negotiations, and these pieces of information did not appear in the February 16, 1977 purchase agreement document prepared by attorney Harland Davis, attorney for the plaintiffs and signed by the parties.

In part, based on these findings, the court adopted the following conclusions of law:

> The plaintiffs are not entitled to rescission of the contract of sale or restitution as they were not entitled to rely on the alleged misrepresentation.

. . . . .

> The information which allegedly formed the basis of the misrepresentation was not material in the instant transaction, the agreement reached by the parties was valid and does not suffer any taint or defect of misrepresentation.

## I. RESCISSION OF THE CONTRACT

█ Numerous cases hold and the Restatement provides that an innocent misrepresentation[2] may be the basis for rescinding a contract.[3] There is no question, as the trial judge's findings of fact state, that the statements made by Walker and his real estate agent in the multiple listing were false.[4] Three questions must be resolved,

---

**2.** In the context of land sale contracts, see *Osborne v. Cal-Am Financial Corp.*, 80 Cal. App.3d 259, 145 Cal.Rptr. 584, 588 (1978), and *Halpert v. Rosenthal*, 267 A.2d 730, 733 (R.I. 1970). *See* Restatement of Contracts § 476, Comment b (1932); Restatement of Restitution § 9(2) (1937); Restatement (Second) of Torts § 552C (1977).

**3.** We decline to consider whether Walker's statements amounted to fraudulent or negligent misrepresentations. The trial judge made no findings on the question and our resolution makes it unnecessary to consider it. It is apparent, however, that Walker had little basis for making statements regarding gravel content. For example, the basis for the statement in the first listing, "over 1 million in gravel," was Walker's neighbor, Riley Curtis, not the "Engineer Report." Walker claimed that Curtis told him an engineering firm had dug core

samples on the property and had prepared a report which estimated the amount of gravel. At trial, Curtis denied telling Walker that there was gravel on the property. He testified that he told Walker there was over one million in *material*, not gravel. As discussed in the text, Walker never actually saw the report. Moreover, Pat Davis, Walker's real estate agent, was aware of these facts, but included the statement on the listing anyway.

**4.** The statements made regarding highway frontage and gravel content in the two listing agreements cannot be characterized as "puffing." They were positive statements "susceptible of exact knowledge" at the time they were made. *Young & Cooper, Inc. v. Vestring*, 214 Kan. 311, 521 P.2d 281, 290 (1974). Although not applicable to real property sales, it is revealing that under the Uniform Commercial Code, where it is frequently necessary to distin-

however, to determine whether Cousineau is entitled to rescission and restitution of the amount paid for the property on the basis of the misrepresentations. First, it must be determined whether Cousineau in fact relied on the statements. Second, it must be determined whether the statements were material to the transaction— that is, objectively, whether a reasonable person would have considered the statements important in deciding whether to purchase the property. Finally, assuming that Cousineau relied on the statements and that they were material, it must be determined whether his reliance was justified.[5]

## A. Reliance on the False Statements

■ As quoted above, in his findings of fact, the trial judge stated, "The plaintiffs did not rely on any misinformation or misrepresentations of defendants." Because this case was decided by a judge without a jury, our standard of review of factual findings is the "clearly erroneous" standard. Alaska R.Civ.P. 52(a). When a finding leaves the court with the definite and firm conviction on the entire record that a mistake has been made, it is clearly erroneous. *Lewis v. Anchorage Asphalt Paving Co.*, 579 P.2d 532, 534 (Alaska 1978). In our opinion, the trial judge's finding that Cousineau and his partners did not rely on the statements made by Walker is clearly erroneous.

Regardless of the credibility of some witnesses,[6] the uncontroverted facts are that Wayne Cousineau was in the gravel extraction business. He first became aware of the property through a multiple listing that said "1 MILLION IN GRAVEL." The subsequent listing stated that there were 80,000 cubic yards of gravel. Even if Walker might have taken the position that the sale was based on the appraisal, rather than the listings, the appraisal does not disclaim the earlier statements regarding the amount of highway frontage and the existence of gravel. In fact, the appraisal might well reaffirm a buyer's belief that gravel existed, since it stated there was a good gravel base. All the documents prepared regarding the sale from the first offer through the final deed of trust make provisions for the transfer of gravel rights. Cousineau's first act upon acquiring the property was to contract with South Construction for gravel removal, and to purchase gravel scales for $12,000.00. We conclude that the court erred in finding that Cousineau did not rely on Walker's statement that there was gravel on the property.

■ We are also convinced that the trial court's finding that Cousineau did not rely on Walker's statement regarding the amount of highway frontage was clearly erroneous. The Cousineaus were experienced and knowledgeable in real estate matters. In determining whether to purchase the property, they would certainly

---

guish "sales talk" from those statements which create express warranties, such definite statements as those made in the listing agreements would most probably be construed as creating an express warranty. *See* Annot., 94 A.L.R.3d 729 (1979).

**5.** Restatement (Second) of Contracts § 306, comment (a), (Tent. Draft no. 11, 1976) states:

A misrepresentation may make a contract voidable under the rule stated in this Section, even though it does not prevent the formation of a contract under the rule stated in the previous section. Three requirements must be met in addition to the requirement that there must have been a misrepresentation. First, the misrepresentation must have been either fraudulent or material. . . . Second, the misrepresentation must have induced the recipient to make the contract.

. . . Third, the recipient must have been justified in relying on the misrepresentation.

**6.** The judge's findings state that the testimony of Camille Davis was "*not credible on those key issues wherein it conflicted with evidence produced by the defendants.*" There are discrepancies in the record as to whether Camille received a copy of the appraisal, whether she or Pat Davis was to obtain a copy of the "Engineer Report," or whether she saw the discrepancies between the first and second listing regarding the amount of gravel. Camille stated at numerous points in her testimony that Cousineau was primarily interested in the property because of its gravel content, while the defendants, as might be expected, took the position that gravel was an *insignificant* part of the transaction. In view of the trial court's findings, we have resolved any conflicts in Camille's testimony in favor of Walker.

have considered the amount of highway frontage to be of importance. Despite Walker's insistence that Cousineau knew the location of the boundary markers, neither Cousineau nor the appraiser ever found them. It is improbable that Cousineau would have started removing gravel from a neighbor's property had he known the correct location of his boundary line.

## B. Materiality of the Statements

Materiality is a mixed question of law and fact. A material fact is one "to which a reasonable man might be expected to attach importance in making his choice of action." W. Prosser, Law of Torts § 108, at 719 (4th ed. 1971). It is a fact which could reasonably be expected to influence someone's judgment or conduct concerning a transaction. *HomeLite v. Trywilk Realty Co.*, 272 F.2d 688, 691 (4th Cir. 1959); *Nader v. Allegheny Airlines, Inc.*, 445 F.Supp. 168, 174 (D.D.C.1978); Restatement of Restitution § 8(2) (1937). Under § 306 of the tentative draft of the Restatement (Second) of Contracts, a misrepresentation may be grounds for voiding a contract if it is either fraudulent or material. Restatement (Second) of Contracts § 306 (Tent. Draft No. 11, 1976). The reason behind the rule requiring proof of materiality is to encourage stability in contractual relations. The rule prevents parties who later become disappointed at the outcome of their bargain from capitalizing on any insignificant discrepancy to void the contract.

We conclude as a matter of law that the statements regarding highway frontage and gravel content were material. A reasonable person would be likely to consider the existence of gravel deposits an impor-

tant consideration in developing a piece of property. Even if not valuable for commercial extraction, a gravel base would save the cost of obtaining suitable fill from other sources. Walker's real estate agent testified that the statements regarding gravel were placed in the listings because gravel would be among the property's "best points" and a "selling point."[7] It seems obvious that the sellers themselves thought a buyer would consider gravel content important.

The buyers received less than three-fourths of the highway frontage described in the listings. Certainly the amount of highway frontage on a commercial tract would be considered important. Numerous cases from other jurisdictions have held discrepancies to be material which were similar in magnitude to those here.[8]

## C. Justifiable Reliance

The trial judge concluded as a matter of law that the plaintiffs "were not entitled to rely on the alleged misrepresentation."

The bulk of the appellee's brief is devoted to the argument that Cousineau's unquestioning reliance on Walker and his real estate agent was imprudent and unreasonable. Cousineau failed to obtain and review the engineer's report. He failed to obtain a survey or examine the plat available at the recorder's office. He failed to make calculations that would have revealed the true frontage of the lot. Although the property was covered with snow, the plaintiffs, according to Walker, had ample time to inspect it. The plaintiffs were experienced businessmen who frequently bought and sold real estate. Discrepancies existed in

7. Walker testified that gravel was not a "selling point." This testimony obviously conflicts with the testimony of his real estate agent, who thought the information was of some importance. A person experienced in real estate sales would seem to be in a better position to evaluate what a buyer would be likely to consider important.

8. *Piazzini v. Jessup*, 152 Cal.App. 58, 314 P.2d 196 (1957) (misrepresentation as to boundary line and existence of termites); *Richard v. Baker*, 141 Cal.App.2d 857, 297 P.2d 674 (1956)

(misrepresentation as to boundary location); *Sorenson v. Adams*, 98 Idaho 708, 571 P.2d 769 (1977) (discrepancy as to amount of tillable acreage); *Bennett v. Finley*, 54 N.M. 139, 215 P.2d 1013 (1950) (misrepresentation as to amount of farmland); *Heverly v. Kirkendall*, 257 Or. 232, 478 P.2d 381 (1970) (existence of encroachment); *Dreifus Lumber Co. v. Werner*, 221 Or. 467, 351 P.2d 684 (1960) (misrepresentation as to boundary line and amount of timber); Annot., 33 A.L.R. 853 § 48–51 (1924).

the various property descriptions which should have alerted Cousineau and his partners to potential problems. In short, the appellees urge that the doctrine of caveat emptor precludes recovery.

In fashioning an appropriate rule for land sale contracts, we note initially that, in the area of commercial and consumer goods, the doctrine of caveat emptor has been nearly abolished by the Uniform Commercial Code and imposition of strict products liability. In real property transactions, the doctrine is also rapidly receding. Alaska has passed the Uniform Land Sales Practices Act, AS 34.55.004–.046, which imposes numerous restrictions on vendors of subdivided property. Criminal penalties may be imposed for violations. The Uniform Residential Landlord and Tenant Act, AS 34.03.010–.380, has greatly altered the common law of landlord and tenant in favor of tenants. Many states now imply warranties of merchantability in new home sales.[9] Wyoming has recently extended this warranty beyond the initial purchaser to subsequent buyers. *Moxley v. Laramie Builders, Inc.*, 600 P.2d 733, 735–36 (Wyo.1979).[10]

There is a split of authority regarding a buyer's duty to investigate a vendor's fraudulent statements, but the prevailing trend is toward placing a minimal duty on a buyer. Recently, a Florida appellate court reversed long-standing precedent which held that a buyer must use due diligence to protect his interest, regardless of fraud, if the means for acquiring knowledge concerning the transaction were open and available. In the context of a building sale the court concluded:

A person guilty of fraudulent misrepresentation should not be permitted to hide behind the doctrine of *caveat emptor.* *Upledger v. Vilanor, Inc.*, 369 So.2d 427, 430 (Fla.App.), *cert. denied*, 378 So.2d 350 (Fla. 1979).

The Supreme Court of Maine has also recently reversed a line of its prior cases, concluding that a defense based upon lack of due care should not be allowed in land sales contracts where a reckless or knowing misrepresentation has been made. *Letellier v. Small*, 400 A.2d 371, 375 (Me.1979). This is also the prevailing view in California, Idaho, Kansas, Massachusetts, and Oregon.[11] On the other hand, some jurisdictions have reaffirmed the doctrine of caveat emptor,[12] but as noted in Williston on Contracts,

> [t]he growing trend and tendency of the courts will continue to move toward the doctrine that negligence in trusting in a misrepresentation will not excuse positive willful fraud or deprive the defrauded person of his remedy.

W. Jaeger, Williston on Contracts § 1515B at 487 (3d ed. 1970).

There is also authority for not applying the doctrine of caveat emptor even though the misrepresentation is innocent. The Restatements, case law, and a ready analogy to express warranties in the sale of goods support this view.

The recent draft of the Restatement of Contracts allows rescission for an innocent material misrepresentation unless a buyer's fault was so negligent as to amount to "a failure to act in good faith and in accord-

9. *See, e. g., Carpenter v. Donohoe*, 154 Colo. 78, 388 P.2d 399, 402 (1964); *Theis v. Heuer*, 280 N.E.2d 300, 303–06 (Ind.1972); *Humber v. Morton*, 426 S.W.2d 554, 557–62 (Tex.1968).

10. *Accord, Barnes v. MacBrown & Co., Inc.*, 342 N.E.2d 611 (Ind.1976). See Note, *Builders Liability for Latent Defects in Used Homes*, 32 Stan.L.Rev. 607 (1980).

11. *Piazzini v. Jessup*, 152 Cal.App.58, 314 P.2d 196, 198 (1957); *Sorenson v. Adams*, 98 Idaho 708, 571 P.2d 769, 776 (1977); *Fox v. Wilson*, 211 Kan. 563, 507 P.2d 252, 266 (1973); *Kannavos v. Annino*, 356 Mass. 42, 247 N.E.2d 708,

712 (1969); *Heverly v. Kirkendall*, 257 Or. 232, 478 P.2d 381, 383 (1970).

12. Recent decisions in Georgia, Illinois and North Carolina are illustrative. *P.B.R. Enterprises, Inc. v. Perren*, 243 Ga. 280, 253 S.E.2d 765, 767 (1979); *Bezin v. Ginsberg*, 59 Ill. App.3d 429, 16 Ill.Dec. 595, 603, 375 N.E.2d 468, 476 (1978) ("Nowhere in the law is the rule of *caveat emptor* more strictly followed than in the arms length transaction involving an interest in real property"); *Odom v. Little Rock & I–85 Corp.*, 40 N.C.App. 242, 252 S.E.2d 217, 219 (1979).

ance with reasonable standards of fair dealing."[13] Restatement (Second) of Contracts § 314, Comment b (Tent. Draft. no. 11, 1976).

In *Van Meter v. Bent Construction Co.,* 46 Cal.2d 588, 297 P.2d 644 (1956), the city of San Diego failed to properly mark the area of a reservoir that needed to be cleared of brush. A lower court concluded that the city's failure to mark the area properly was an innocent mistake, and that a bidder's actions in failing to discover the true area to be cleared was negligent. Recovery was denied because the city's misrepresentation was not willful. The California Supreme Court reversed, first noting that a party's negligence does not bar rescission for mutual mistake, and then concluding:

> There is even more reason for not barring a plaintiff from equitable relief where his negligence is due in part to his reliance in good faith upon the false representations of a defendant, although the statements were not made with intent to deceive. A defendant who misrepresents the facts and induces the plaintiff to rely on his statements should not be heard in an equitable action to assert that the reliance was negligent unless plaintiff's conduct, in the light of his intelligence and information, is preposterous or irrational.

*Id.* 297 P.2d at 648 (citations omitted). The Massachusetts Supreme Judicial Court has expressed a similar view in *Yorke v. Taylor,* 332 Mass. 368, 124 N.E.2d 912, 916 (1955).[14]

We do not contend that real property transactions are the same as those involving sales of goods. Nevertheless, an analogy to the applicability of the doctrine of caveat emptor under the Uniform Commercial Code is helpful.[15] Under the Code, factual statements regarding the sale of goods constitute an express warranty. AS 45.05.094.

13. As an illustration of "fair dealing," the proposed Restatement suggests the following example:
> A, seeking to induce B to make a contract to buy land, tells B that the land is free from encumbrances. Unknown to either A or B, C holds a recorded and unsatisfied mortgage on the land. B could easily learn this by walking across the street to the register of deeds in the courthouse but does not do so. B is induced by A's statement to make the contract. B's reliance is justified since his fault does not amount to a failure to act in good faith and in accordance with reasonable standards of fair dealing, and the contract is voidable by B.

Restatement (Second) of Contracts § 314, Comment b, Illustration 2 (Tent. Draft no. 11, 1976).

14. *See also Sorenson v. Adams,* 98 Idaho 708, 571 P.2d 769, 776 (1977), in which the tillable acreage sold was misrepresented by reference to an erroneous form prepared by the Department of Agriculture. The buyers sought damages for the shortage, and the Supreme Court of Idaho reversed a judgment of nonsuit, stating:
> In short, the general rule is that "a vendor may be liable in tort for misrepresentations as to the area of land conveyed, notwithstanding such misrepresentations were made without actual knowledge of their falsity." The reason, of course, is that the parties to a real estate transaction do not deal on equal terms. An owner is presumed to know the boundaries of his own land, the quantity of his acreage, and the amount of water available. If he does not know the correct information, he must find out or refrain from making representations to unsuspecting strangers. "Even honesty in making a mistake is no defense as it is incumbent upon the vendor to know the facts."

*Id.* 571 P.2d at 776 (citations omitted). In addition, the sellers argued that the buyers had no right to rely on the A.S.C. figures, since they could have checked the figures themselves or conducted their own survey. In rejecting this argument, the court stated:
> "False statements found . . . to have been made and relied on cannot be avoided by the appellants by the contention that the respondents could have, by independent investigation, ascertained the truth.
> "The appellants having stated what was untrue cannot now complain because respondents believed what they were told. Lack of caution on the part of respondents because they so believed, and the contention that respondents could have made an independent investigation and determined the true facts, is no defense to the action." *Weitzel v. Jukich,* 73 Idaho 301, 305, 251 P.2d 542, 544 (1953). *And see, Lanning v. Sprague,* [71 Idaho. 138, 227 P.2d 347] *supra.*

*Id.*

15. We also looked to the Uniform Commercial Code in *Rego v. Decker,* 482 P.2d 834, 838 (Alaska 1971), to decide analogous questions in the law of the land sale contracts.

The official comment to section 2–316 of the Code (codified as AS 45.05.100), dealing with disclaimers of warranties, states:

> Application of the doctrine of "caveat emptor" in all cases where the buyer examines the goods regardless of statements made by the seller is, however, rejected by this Article. Thus, if the offer of examination is accompanied by words as to their merchantability or specific attributes and the buyer indicates clearly that he is relying on those words rather than on his examination, they give rise to an "express" warranty.

Numerous cases have concluded that a buyer is entitled to rely on an express warranty, regardless of an inadequate examination of the goods.[16]

■ Furthermore, the protections of the Code extend to highly sophisticated buyers in arms length transactions as well as to household consumers. Other than tradition, no reason exists for treating land sales differently from the sale of commercial goods insofar as application of the doctrine of caveat emptor is involved. We conclude that a purchaser of land may rely on material representations made by the seller and is not obligated to ascertain whether such representations are truthful.

A buyer of land, relying on an innocent misrepresentation, is barred from recovery only if the buyer's acts in failing to discover defects were wholly irrational, preposterous, or in bad faith.

■ Although Cousineau's actions may well have exhibited poor judgment for an experienced businessman, they were not so unreasonable or preposterous in view of Walker's description of the property that recovery should be denied. Consequently, we reverse the judgment of the superior court.

## II. RESTITUTION

■ Walker received a total of $99,000.00 from Cousineau and his partners, but the appellants are not entitled to restitution of this amount. Cousineau apparently caused extensive damage to one building on the property, and he removed 6,000 cubic yards of gravel. Walker should be allowed some recoupment for these items, plus an amount for the fair rental value of the property less reasonable costs of rental.

It is necessary to remand this case to the trial court to determine the correct amount of damages.

REVERSED and REMANDED.

**16.** *See, e. g., United States v. Aerodox, Inc.,* 469 F.2d 1003 (5th Cir. 1972); *General Electric Co. v. U. S. Dynamics, Inc.,* 403 F.2d 933 (1st Cir. 1968); *City of Paragould v. Int'l Power Machinery Co.,* 233 Ark. 872, 349 S.W.2d 332 (1961).