[No. 12716–1–I.   Division One.   March 24, 1986.]

SKAGIT STATE BANK, *Appellant,* v. RUSSELL
RASMUSSEN, ET AL, *Respondents.*

*Bannister, Bruhn, Cuningham & Clark* and *Stanley K. Bruhn,* for appellant.

*Michael L. Lewis,* for respondents Hayton.

*G. Paul Carpenter,* for respondent Seattle–First.

SWANSON, J.—Skagit State Bank (Skagit Bank) appeals that portion of an otherwise favorable judgment and decree of foreclosure that dismissed its claims against the interests of Robert Hayton and Susan Hughes–Hayton, husband and wife. Skagit Bank instituted foreclosure proceedings against a 60–acre parcel of land known as the "Bulb Farm" following default on a $350,000 Small Business Administration (SBA) loan and asked for a deficiency judgment against all of the defendants, including the Haytons. Defendants Hayton, Thomas Flint, and Russell Rasmussen each owned a one–third undivided interest in the Bulb Farm.

Skagit Bank contends that judgment should have been entered against Hayton for the balance owing on the loan and the foreclosure decree should have included the Haytons' interests as well, because Hayton (1) signed the original promissory note for $350,000; (2) signed a mortgage of the Bulb Farm in favor of Skagit Bank securing the loan; and (3) signed an SBA guaranty of the loan. In addition, Hayton printed his wife's name on the note and guaranty. The trial court entered a judgment totaling approximately $430,000 in favor of Skagit Bank against Rasmussen, Flint, and Snow Goose Produce, Inc., a corporation, but permitted foreclosure only against Flint and Rasmussen's two–thirds interest in the Bulb Farm.

In 1973 Robert Hayton, Thomas Flint, and Russell Rasmussen formed a partnership known as the Dry Slough Hay Company. In 1974 the three partners purchased a 60–acre parcel of land in Skagit County known as the "Bulb Farm." When Dry Slough ceased operations in 1975 and sold its

last crops in 1976, the former partners divided the assets and went their separate ways but retained ownership of the Bulb Farm as tenants in common. Hayton then began farming independently, but the three maintained a bank account in the company name for the purpose of making mortgage payments on the property.

In 1976 Flint and Rasmussen, together with Arnie Garborg, incorporated Snow Goose Produce, Inc., a retail and wholesale vegetable operation. In the same year, Hayton, Rasmussen, and Flint entered into a written agreement permitting Snow Goose to farm the southern two–thirds of the Bulb Farm and Hayton to farm the northern one–third. Hayton had no formal connection with Snow Goose, although he did make a short–term loan to Snow Goose and sold some produce to the company.

Following 2 unprofitable years that resulted in debts of approximately $240,000 to Skagit State Bank, Snow Goose applied for a $350,000 SBA loan, the transaction that is in issue in this appeal. Initially, the loan application was rejected. Flint and Rasmussen negotiated directly with both Skagit Bank and the SBA. At some point, it became necessary for Rasmussen and Flint to pledge their two–thirds interest in the Bulb Farm as collateral for the Snow Goose loan. Testimony at trial was in conflict, but the trial court found that Skagit had advised Flint and Rasmussen that Hayton's signature would be required to permit such a pledge.

The loan documents, with the possible exception of the mortgage, were prepared by the SBA and then given by Skagit Bank to Flint to take to Hayton's farm for Hayton's signature. The notarization by a Skagit Bank employee on the mortgage that Hayton signed in the presence of a Bank officer was false. Flint testified that he told Hayton that the documents only involved Hayton's release of two–thirds of the property. Both Flint and Garborg testified that there were never any discussions with Bank officials indicating that Hayton was to co–sign the note or guarantee the loan.

No dispute exists that on March 7, 1978, Hayton signed

the $350,000 promissory note, a mortgage in favor of Skagit Bank of the entire Bulb Farm, an SBA guaranty form, and a separate addendum to the guaranty. Hayton signed individually and as a partner of Dry Slough, the company that had ceased operation in 1976. In addition, Hayton printed his wife's name on the note and guaranty. The same documents were also signed in various capacities by Flint, Rasmussen, and Arnie Garborg.

The parties are in agreement that Hayton had no contact with Skagit Bank during the loan application process; his name was not on the original SBA loan application form. He was never asked to furnish the biographical and financial data required of all other participants in the transaction. Skagit Bank, contrary to its general policy when signatures were obtained outside of the office, did not contact Hayton to verify his signature. Hayton's first communication with the Bank occurred in April 1980, when he received a notice of default. Skagit Bank does not contend that Hayton received any benefit from the loan proceeds, which were used to pay off Snow Goose's creditors, primarily Skagit Bank.

Hayton testified that he did not read the documents that Flint brought him to sign and intended to incur no obligation in conjunction with the Snow Goose loan. Hayton stated, however, that he had a reasonable familiarity with the type of documents involved and admitted he would have understood them had he read them.

On appeal, Skagit Bank assigns error to the trial court's determination that Hayton was not obligated by any of his signatures because he believed the only effect of the documents was to permit the other two owners of the Bulb Farm—Flint and Rasmussen—to pledge their two–thirds interest in the property as collateral for the $350,000 loan. The trial court found that Hayton had signed the documents based on representations made by his friend and former business partner, Flint. Skagit Bank also challenges the trial court's conclusion that Flint, who picked up the documents from the Bank and brought them to Hayton for

his signature, was Skagit's agent as to the legal effect of the documents and that the Bank was therefore bound by his representations. Skagit Bank also requests attorneys' fees and expenses pursuant to RAP 18.1.

The primary issue on appeal is whether Hayton is bound by his signature on documents that he voluntarily signed but did not read and about whose contents he was mistaken. We conclude that the trial court properly relieved Hayton of liability because Flint misrepresented the legal effect of the documents he brought to Hayton for signature.

General contract principles permit a party to avoid an obligation if assent has been induced by misrepresentation. Misrepresentation, either fraudulent or nonfraudulent, "is an assertion that is not in accord with the facts." Restatement (Second) of Contracts § 159 (1981). A statement intended to be truthful may nonetheless be a misrepresentation because of ignorance or carelessness. Restatement § 159, comment *a*. A material innocent misrepresentation is sufficient upon which to base a claim for rescission. *Anthony v. Warren*, 28 Wn.2d 773, 184 P.2d 105, 190 P.2d 88 (1947); *Algee v. Hillman Inv. Co.*, 12 Wn.2d 672, 123 P.2d 332 (1942); *Kruger v. Redi–Brew Corp.*, 9 Wn. App. 322, 511 P.2d 1405 (1973); E. Farnsworth, *Contracts* § 4.12, at 243 (1982).[1]

Restatement (Second) of Contracts § 164 provides that a contract is voidable because of a misrepresentation

(1) If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying[.]

Thus, a party seeking relief on the basis of an innocent

---

[1] "It is not necessary, in order that a contract may be rescinded for fraud or misrepresentation, that the party making the misrepresentation should have known that it was false. Innocent misrepresentation is sufficient, for though the representation may have been made innocently, it would be unjust and inequitable to permit a person who has made false representations, even innocently, to retain the fruits of a bargain induced by such representations." (Footnote omitted.) 12 S. Williston, *Contracts* § 1500, at 400–01 (3d ed. 1970).

misrepresentation must demonstrate (1) that the misrepresentation was material; (2) that he relied on it; and (3) that his reliance was justified. *Cousineau v. Walker*, 613 P.2d 608, 612 (Alaska 1980); *First Nat'l Bank & Trust Co. v. Notte*, 97 Wis. 2d 207, 293 N.W.2d 530, 538 (1980).

The trial court's finding that Hayton signed the documents on the basis of misrepresentations as to their character made to him by Flint, his friend and former business partner, is amply supported. Testimony at trial revealed that Flint brought the documents out to Hayton's farm for signature and told Hayton that they only permitted Flint and Rasmussen to pledge their two–thirds interest in the Bulb Farm. Both Flint and Garborg stated that they did not believe that Hayton was in fact guaranteeing the loan.[2] Hayton testified and the court found that his understanding of the transaction was based on what Flint had told him.[3]

A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent. *First Nat'l Bank & Trust v. Notte*, 293 N.W.2d at 539.[4] Hayton was told that the documents involved the pledge of Flint's and Rasmussen's interest in the Bulb Farm. This information confirmed his prior knowledge of the Snow Goose

---

[2] We find no support for Skagit's allegation, asserted during oral argument, that Hayton intended to "help out" his friends and former business partners by personally guaranteeing the $350,000 loan.

[3] "Hayton signed the documents at his farm as a result of representations made to him by his good friend and long–time acquaintance and business partner Flint to the effect that Hayton's signature on these documents was necessary in order to allow Flint and Rasmussen to pledge their two–thirds (⅔) interest in the property as security for the SBA loan to Snow Goose Produce, Inc. This was Flint's understanding of the purpose and legal effect of the documents, based upon the explanations given to him by officers or agents of Skagit State Bank, and Flint so testified." Finding of fact 21, in part.

[4] Section 162(2) of the Restatement provides:
"A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so."

transaction and his understanding of his role in the transaction. Such representations, coming from a friend and which suggested no personal liability, would very likely induce a reasonable person to sign the documents. There can be no serious contention that Hayton would have signed these documents had he known that he was obligating himself personally on the Snow Goose loan. Indeed, we cannot imagine a more material misrepresentation than one that goes to the type of documents involved, the very essence of the transaction, with regard to the parties before us. *Cf.* 1 S. Williston, *Contracts* § 95A (1957) (if one, without negligence, signs an agreement believing it to be an instrument of a different character, the contract is void); *Chandler v. Aero Mayflower Transit Co.,* 374 F.2d 129, 136 (4th Cir. 1967); *Borden v. Day,* 197 Okla. 110, 168 P.2d 646 (1946).

█ We also find that Hayton's reliance on Flint's representations was justified under the circumstances, and in this connection we must address whether Hayton's failure to read the loan documents, despite his admission that had he done so, he would have understood their meaning, precludes relief under the principles enunciated above. Section 172 of the Restatement provides:

> A recipient's fault in not knowing or discovering the facts before making the contract does not make his reliance unjustified unless it amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.

The comment to this section explains:

> [T]he mere fact that [the recipient of the misrepresentation] could, by the exercise of reasonable care, have avoided the mistake caused by the misrepresentation does not bar him from relief. The rule is similar to that applicable to mistake in general (§ 157), and its justification is particularly strong since here the recipient's mistake is the result of a misrepresentation. . . . The recipient's fault makes his reliance unjustified only in extreme cases where he has failed to act in good faith and in accordance with reasonable standards of fair dealing.

At the time Flint brought the documents to Hayton for signature, Hayton had never set foot in Skagit Bank. There was no reason at that time for Hayton to suspect that he was entering a $350,000 transaction with Skagit Bank and the SBA.[5] Hayton knew only that Snow Goose was seeking a loan and that his signature was necessary to permit Flint and Rasmussen to pledge their interest in the Bulb Farm. At the time Flint brought the documents to Hayton's farm, Hayton was in the midst of planting cauliflower. He spoke only briefly with Flint before signing the papers on the "bed of [a] flatbed one–ton truck." Although we do not condone Hayton's failure to read the documents prior to signing them, the findings support the trial court's conclusion that his failure to do so under the circumstances of this case does not constitute negligence.[6] We find that Hayton was entitled to rely on the material misrepresentations made by Flint regarding the legal effect of the documents. We decline to adopt a rule that Hayton's failure to read the documents automatically bars him from relief. *See Cousineau v. Walker, supra* (experienced buyer of land barred from relief only if failure to discover innocent misrepresentation was wholly irrational, preposterous, or in bad faith); *First Nat'l Bank & Trust Co. v. Notte, supra.*

It is possibly true, as Skagit asserts, that the mistake would not have occurred but for Hayton's failure to read

---

[5]We refuse to believe that Skagit Bank or the SBA deliberately included Hayton's name on the loan documents with the expectation that Hayton would sign the documents without reading them and thereby inadvertently bind himself and his community to pay a $350,000 loan. There is no evidence in the record to support such an intention. It taxes one's credulity to believe that Hayton would subject himself other than by mistake to a $350,000 loan in the complete absence of consideration or financial benefit.

[6]"Robert Hayton was not aware of the legal effect of the instruments that he signed. Robert Hayton was not negligent in signing them in the fashion and manner that he signed them as he thought that the instruments were to permit two–thirds ($\frac{2}{3}$) of the real estate . . . to be given as collateral for the loans described in this lawsuit. He further believed he bore no responsibility on these obligations, but rather only Flint, Rasmussen and Snow Goose Produce, Inc. would be responsible legally for the debts." Conclusion of law 4.

the documents he signed. However, the same might be said regarding Skagit's own careless handling of the documents in this case. Skagit gave the documents to Flint to obtain the signature of a party it had never dealt with and about whom it had no financial data. A Skagit employee then falsely acknowledged that Hayton had signed in her presence. It is therefore just as likely that the mistake would have been avoided had Skagit followed its own standard procedures and contacted Hayton to verify his signature or required him to sign in the bank.[7]

Having established the elements justifying avoidance on the basis of a material innocent misrepresentation, we must address Flint's unusual role in this transaction. The principles set forth above are generally applied to situations in which the parties have been negotiating directly with one another. In the case before us, the parties agree that Hayton never set foot in Skagit Bank or had any contact with Skagit Bank prior to a notice of default; the misrepresentations were made by Flint. Although there is a dearth of relevant case law, authority supports the proposition that the principles of misrepresentation apply when the misrepresentation is made by one not a party to the contract:

(2) If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by one who is not a party to the transaction upon which the recipient is justified in relying, the contract is voidable by the recipient, unless the other party to the transaction in good faith and without reason to know of the misrepre-

---

[7]The following finding was uncontested: "The standard practice of Skagit State Bank is to have all loan and mortgage documents signed at an office of the Bank, in front of a Bank officer. Additionally, where important documents are signed away from the Bank, the practice of the Bank is to make telephone contact, or contact with the signer to insure that the signature is genuine and that the signer understands the documents and intends to execute them. Skagit State Bank did not follow it's [sic] standard practice in this case. Skagit State Bank did not contact Robert or Susan Hughes–Hayton to discuss these documents or verify their signatures. There was no explanation made to Robert Hayton by the Plaintiff as to the true effect of the instruments he signed. Robert Hayton received no monetary consideration or other economic benefit for signing the loan documents." Finding of fact 22.

sentation either gives value or relies materially on the transaction.

Restatement § 164(2); *see also Lawton v. Dracousis,* 14 Mass. App. 164, 437 N.E.2d 543, 548 (1982).

In form, Flint was, of course, not a third party but rather a principal on all of the documents. However, the unique circumstances of this case justify treating Flint as a third party for purposes of our decision. Hayton did not suspect that he was incurring a significant personal obligation to Skagit Bank; nor did he know that this obligation placed him on an equal footing with Flint, Rasmussen, and Snow Goose Produce, Inc.

The trial court rested its decision on the conclusion that Flint was the Bank's agent for purposes of securing Hayton's signature and that the Bank was therefore bound by Flint's representations regarding the legal effect of the documents. If Flint was the Bank's agent for this purpose, then the Bank as principal would be bound by Flint's material representations and any other acts within the authority that the principal knowingly permits the agent to assume. *See, e.g., Wimmer v. Parsons,* 141 Wash. 422, 251 P. 868 (1926); *O'Daniel v. Streeby,* 77 Wash. 414, 137 P. 1025 (1914); 3 Am. Jur. 2d *Agency* § 264 (1962).

We do not rest our decision on a finding that Flint was Skagit Bank's agent, however, even though there is evidence in the record that would support such a conclusion.[8] Whether Flint was a true agent or whether he was merely an "errand boy" seeking a signature required for his own benefit, Skagit Bank was responsible for the representations that were made to Hayton. Williston states that misrepresentation by a third party can be the basis of rescission:

---

[8]For example, in response to a question as to why Skagit Bank and the SBA did not communicate directly with Hayton regarding the transaction, Mr. Bishop, Skagit Bank's president, replied: "We were relying on the party that initiated the application and the principal partner in the firm to convey that information to them." Report of Proceedings, at 200.

[w]here, although the misrepresentations were not made by one acting as agent of the party benefited, the latter was or should have been cognizant of them, or was the cause of their being made, or gave no value for what he received, or gave no value until after he had learned of the misrepresentations.

(Footnote omitted.) 12 S. Williston § 1518, at 584.[9]

In *United States v. Burke,* 548 F. Supp. 724 (D.S.D. 1982), the United States brought suit against the decedent and his wife, makers of a promissory note given to secure an FHA loan, and against four individuals who had pledged property to secure payment of the note. The decedent had signed the note in the FHA office and was then permitted to take the note and security agreement out of the office to obtain the signature of his wife. Upon default, the parties discovered that the wife's signature had been forged. The parties pledging property had done so in the belief that the wife's signature was genuine. Even though the Government, too, had believed the signature to be genuine, the court noted, under circumstances somewhat similar to those before us, that the forged signature constituted a non-fraudulent misrepresentation to the pledgors:

Although the decedent was primarily responsible for pro-curing the forgery, the Government contributed substan-tially to the procurement by allowing the decedent to take the promissory note and security agreement out of the FHA office to obtain his wife's signature. The Gov-ernment must be held accountable for any misrepresen-tations appearing in the loan and pledge documents which could have been avoided by prudent office proce-dures.

*Burke,* at 727.

Finally, we note that Skagit Bank did not give value or change its position in reliance on Hayton's participation as either a principal or guarantor in this transaction. The

---

[9]"It may well be asked what essential difference is there in taking advantage of a misrepresentation by a third person, and silently taking advantage of a known erroneous belief of the other party, however acquired". 12 S. Williston, at 585 n.13.

record does not indicate that either Skagit Bank or the SBA relied in any manner on Hayton's participation in this transaction other than his ability to permit a pledge of two–thirds of the Bulb Farm.[10] The following finding by the trial court is amply supported by the record:

> Skagit State Bank through Mr. Bishop, advised Flint and/or Rasmussen that they would be required to pledge their two–thirds (⅔) interest in the property as security for the SBA loan, and further advised them that because of the common ownership, Hayton's signature would be required on the documents in order to allow them to pledge their two–thirds (⅔) interest. The fact that Skagit State Bank was looking to the two–thirds (⅔) interest of Flint and Rasmussen is evidenced by a memorandum and Mr. Bishop's hand written note, which he identified in testimony at trial.

Finding of fact 18.

The decision of the trial court is affirmed.

GROSSE, J., concurs.

RINGOLD, A.C.J. (dissenting)—With a feat of legerdemain, the majority turns a borrower into the agent of the lender with authority to make misrepresentations as to the

---

[10]Mr. Bishop, president of Skagit Bank, acknowledged during cross examination that there had been substantial communication between the Bank and the principals in Snow Goose regarding their two–thirds interest in the Bulb Farm. The list of collateral, prepared by Snow Goose and submitted to Skagit and subsequently to the SBA in support of its loan application, referred only to Flint's and Rasmussen's two–thirds interest. Valuations of various items of collateral, apparently added to this list by Mr. Bishop, also applied only to two–thirds of the property.

The testimony of Mr. Blanco, the SBA officer who processed Snow Goose's application, is also consistent with a finding that there was never any intent to require Hayton's personal guaranty of the loan. Mr. Blanco's testimony indicates that Hayton's signature was sought only to release the two–thirds interest of Flint and Rasmussen. Mr. Blanco stated that a guaranty by *Dry Slough* was requested and when asked about the necessity of this Mr. Blanco responded as follows: "The property, first of all, was in part owned by a different individual than were the owners of the Dry Slough Hay Company and in order to secure that property as collateral, we had to ask for a guaranty of that company since one of the individuals was not involved with the applicant's business." Report of Proceedings, at 212–13.

nature of documents which the lender desires the guarantor to sign. This sleight of hand cannot withstand logic. I respectfully dissent and would reverse.

The mere fact that Skagit may have been careless in giving the documents to Flint to obtain Hayton's signature has no bearing on the legal issues. Flint's misrepresentations cannot be attributed to the bank. A guarantor cannot be heard to say when he signs both a promissory note and a mortgage to assist his friends and former business partners in obtaining a loan for $350,000 that he was unaware of the legal consequences. *National Bank v. Equity Investors*, 81 Wn.2d 886, 912–13, 506 P.2d 20 (1973); *Lyall v. DeYoung*, 42 Wn. App. 252, 256, 711 P.2d 356 (1985) ("a voluntary signator to a contract cannot resist application of its terms simply by stating ignorance of its contents"). Hayton does not present any basis for excusing his failure to read the documents which he was signing, or to justify reliance on Flint's representations.[11]

Whether the bank is entitled to the mortgage lien upon Hayton's one–third interest is another matter. The evidence indicates that though he signed the mortgage of the Bulb Farm in favor of Skagit, it was outside the presence of the notary public, contrary to the assertion in the jurat. The notary did nothing to verify Hayton's signature and the trial court found that the acknowledgment was false. The concerns expressed by the Supreme Court in *Werner v. Werner*, 84 Wn.2d 360, 366, 526 P.2d 370 (1974) should be

---

[11]Finding of fact 21 states:

"Robert Hayton admits that he signed the documents, but testified that he signed without reading them. Hayton signed the documents at his farm as a result of representations made to him by his good friend and long–time acquaintance and business partner Flint to the effect that Hayton's signature on these documents was necessary in order to allow Flint and Rasmussen to pledge their two–thirds (⅔) interest in the property as security for the SBA loan to Snow Goose Produce, Inc. *This was Flint's understanding of the purpose and legal effect of the documents,* based upon the explanations given to him by officers or agents of Skagit State Bank, and Flint so testified. Flint picked up all of the papers at the office of Skagit State Bank and delivered them to Hayton at his farm for signature." (Italics mine.)

reemphasized:

> As public officers, notaries enjoy a unique status within our legal system as the notarial seal is a mandatory legal prerequisite to the valid execution of many documents. In an age of burgeoning land sales, the notarial function has become the keystone of real estate transactions. While in many instances the acknowledgement is affixed perfunctorily, the presence of the jurat serves to assure the grantees that the signatures of unknown and often unseen grantors are bona fide. As stated by John Wigmore in 1928:
>
>> The notary's certificate of acknowledgment of a deed is the pillar of our property rights. All titles depend on official records; and all official records depend on the notary's certificate of acknowledgment. And these pillars of property become a treacherous support when they are permitted with forgery. A practice which permits forgery is as dangerous in policy as it is unsound in principle.
>
> Wigmore, *Notaries Who Undermine Our Property System,* 22 Ill. L. Rev. 748, 749 (1928).

(Footnote omitted).

The bank's agent violated the obligation of a notary public.[12] I would, therefore, exclude Hayton's one–third of the bulb farm from the mortgage lien.

Review granted by Supreme Court June 3, 1986.

---

[12]"The role of the notary public is of great importance in the validation of the signatories to various legal documents. The abundance of Washington statutes which incorporate the notarial function are evidence of the importance of the jurat." *Werner,* at 366 n.1.