**Lester A. BARRER, Appellant,**

**v.**

**WOMEN'S NATIONAL BANK.**

**No. 83–2206.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 25, 1985.

Decided May 10, 1985.

James T. Fuller, Washington, D.C. (Pro Hac Vice), with whom Robert P. Watkins, Washington, D.C., was on brief, for appellant.

Jeffrey M. Johnson, Washington, D.C., with whom Barry William Levine, Washington, D.C., was on brief, for appellee.

Before MIKVA, EDWARDS and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge.

The appellant, Lester A. Barrer, brought this action against Women's National Bank ("the Bank" or "WNB") for damages he allegedly sustained as the result of the Bank's eleventh hour decision to rescind a loan agreement. WNB defended and moved for summary judgment on the ground that Barrer had made innocent material misrepresentations in his loan application that justified the Bank's avoidance of the contract. The magistrate found that Barrer had made five material representations to the Bank that were not in accord with the facts and, on that basis, granted WNB's motion for summary judgment. We find that the magistrate failed to apply the correct legal test for determining when an innocent material misrepresentation permits the rescission of a contract, and that there are material issues of fact that make summary judgment inappropriate. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. *Factual Background*

On June 24, 1981, Lester Barrer's personal home was sold at a tax sale by the Internal Revenue Service ("IRS") because of his inability to pay certain employment taxes. The taxes were owed by Barrer's closely-held corporation, Today News Service, Inc., and had been asserted against

him personally as a 100 percent penalty pursuant to 26 U.S.C. § 6672 (1982). At the tax sale, Barrer's home was purchased by Edward L. Curtis, Jr., for $16,326, subject to the underlying mortgage. The Internal Revenue Code provides for the redemption of real property within 120 days of a tax sale upon payment to the purchaser of the purchase price plus interest.[1] Barrer accordingly was advised by the IRS that he could redeem his home by delivering $17,400, in cash or its equivalent, to the IRS or to Curtis on or before October 22, 1981.

On October 20, 1981, Barrer went to WNB to discuss a personal loan for the redemption amount. Apparently, on the previous day, Barrer had approached one other bank about the possibility of a loan; however, he had been advised by the President of that bank that it would not be possible to process an application for a loan in the amount sought by Barrer in such a short period of time.[2] Barrer indicated in his deposition statement that he waited until the last minute to seek a bank loan because he had been involved in serious negotiations over the sale of his business and had expected to close on the sale before October 20, 1981, and that he had intended to use the proceeds from that sale to redeem his house.[3]

At WNB, Barrer spoke with Emily Womack, the President of the Bank, with whom he had a professional acquaintance. Barrer's corporation published the *Women Today Newsletter,* a periodical to which the Bank subscribed and which, according to Barrer's deposition statement, had published an article on the Bank.[4] Barrer's corporation also maintained an account with the Bank. Womack gave Barrer a loan application form, which he completed and re-

turned to her the next day, October 21, along with certain supporting documents, including those concerning the tax sale and his efforts to sell the business.

Barrer evidently explained to Womack that he had experienced severe financial difficulties since his wife and long-time professional collaborator died of cancer in 1978.[5] At his deposition, Barrer testified that he told Womack that, for a period after his wife died, he lost his motivation to work and that the business they had jointly owned and managed suffered serious economic reverses as a consequence.[6] Those reverses led to Today News Service, Inc.'s inability to pay its employment taxes and ultimately to the tax sale of Barrer's home. Womack sympathized with Barrer's plight and expressed to one of her bank officers the hope that they could help him.[7]

On October 21, Barrer and Womack reviewed his loan application line by line. With reference to his home mortgage, Barrer told her that his house was worth approximately $130,000 and that Columbia First Federal Savings and Loan Association ("Columbia") held a $65,000 mortgage on it. When asked whether his mortgage payments were up-to-date, Barrer recalls replying that he "thought" he was two months behind.[8] By contrast, Womack testified that Barrer said he was current.[9] In fact, Barrer was six months behind. Barrer explained that he thought his obligation to pay his mortgage ceased at the time of the tax sale and that he did not realize that he was responsible for more than the two months' mortgage payments that had been due before the sale.[10]

Because Barrer's mortgage payments were in arrears, Columbia had begun fore-

1. 28 U.S.C. § 6337 (1982).

2. Deposition of Lester A. Barrer ("Barrer Dep."), Joint Appendix ("J.A.") 310–11.

3. *Id.*

4. *Id.* at 44.

5. *See,* Deposition of Emily H. Womack ("Womack Dep."), J.A. 404; Barrer Dep., J.A. 109–11.

6. Barrer Dep., J.A. 109–11.

7. Womack Dep., J.A. 390, 414.

8. Barrer Dep., J.A. 127.

9. Womack Dep., J.A. 396, 401.

10. Barrer Dep., J.A. 127–31.

closure proceedings—also a fact that Barrer did not disclose to Womack. In his deposition statement, Barrer accounted for this failure by stating that on October 21, 1981, he did not know that Columbia had initiated foreclosure proceedings.[11]

On the liability side of the loan application, Barrer revealed that he had borrowed $40,000 from friends and relatives. Barrer testified that he explained to Womack that he had borrowed this sum to ease the financial difficulties he had encountered since his wife's death.[12]

Barrer also disclosed the $38,000 tax liability which was the cause of the tax sale. He did not indicate, however, a contingent liability for an additional $11,000 in employment taxes owed by his corporation which had not, at that time, been asserted against him personally under 26 U.S.C. § 6672. Barrer seems to argue both that this $11,000 was included in the $38,000 figure, and that because the $11,000 tax liability had not been assessed against him personally it was not a contingent liability that he was obligated to reveal.[13]

Nor did Barrer list as a contingent liability a $5,300 debt owed by his wife's estate to IBM. The Bank argues that this debt should have been revealed because Barrer had demonstrated, by requesting the probate court to charge the obligation to him, that he thought himself responsible for the debt. Barrer contends that because the probate court ultimately ruled that the obligation belonged to the estate, his failure to list the amount on the loan application was not a misrepresentation.

Finally, Barrer did not indicate on the loan application that he had approximately $1,500 in unsatisfied judgments pending against him. However, he answered in the affirmative to a specific question on the application form which inquired whether he was "a defendant in any suits or legal actions."[14] Barrer also stated at his deposition that he told Womack that he owed small amounts arising out of these lawsuits. He said that he explained to her that these debts involved disputes over medical bills and that he expected his major medical insurance to cover most of them.[15]

After Barrer and Womack finished discussing the content of the completed loan application form and Barrer's financial situation, Womack indicated that, in order for the Bank to grant the loan, the IRS would have to agree to subordinate its claim with respect to Barrer's house to that of WNB. On October 22, 1981, the last redemption day, Barrer obtained the subordination agreement from the IRS and delivered it to the Bank. Barrer then executed a collateral note for $17,400, payable in 90 days at 15 percent interest, which gave the Bank the right to a security interest in his house.[16] The Bank's Vice President, Emma Carrera, gave Barrer a cashier's check, payable to him, for the loan amount. Prior to granting the loan, neither Womack nor Carrera obtained a credit report on Barrer and neither officer phoned Columbia about the status of his mortgage.

That afternoon, Barrer delivered the endorsed check to the IRS in accordance with the required redemption procedure and returned home, believing that his home had been saved.

In the meantime, the tax sale purchaser, Curtis, phoned WNB and spoke with Carrera. According to her deposition, their conversation was as follows:

> He stated that he had some information that he thought would be of interest to me on the loan that the bank had made to Mr. Barrer. I told him at that time that I could not discuss any loan with him in regards to who it was or what it was for. He said he didn't want

11. *Id.* at 140–44.

12. Barrer Dep., J.A. 90–91; *see also* Womack Dep., J.A. 404.

13. Brief for Appellant at 11–12.

14. Loan Application, J.A. 576.

15. Barrer Dep., J.A. 103, 118–20.

16. Collateral Note, J.A. 652.

me to do any discussing, but he just wanted to tell me some facts.

He then told me he was the purchaser of the property at the tax sale. He couldn't believe that a bank would make a loan to a man who was in the credit position that he was in; that there were liens and judgments and so forth against him and at that time, I signalled for my secretary to bring me the file on Mr. Barrer.

I quickly looked through the file and found there wasn't a credit report in the file. At that time I told her to pull a credit report on him, which she did, and brought it to me within just a couple of minutes.

In the meantime, Mr. Curtis was continuing to talk. He had mentioned something about some kind of code that says that a person who buys a property at a tax sale cannot interfere with the owner's right to redeem, but that he didn't feel he was doing that just by informing the bank of Mr. Barrer's situation.

He put me on a conference call with a gentleman who identified himself as an official of the mortgage company [Columbia] that held the mortgage on Mr. Barrer's property. He [Mr. Ford] asked me at that time who, in his organization, had given us a credit report.

... I ... answer[ed] him ... that it was my understanding that all of the savings and loan associations required a written request for credit rating [sic] on any of the mortgages that they held and it had always been, to my knowledge, their policies not to give a reference by phone.

[Mr. Ford] said at that point he thought it was important that we know that Mr. Barrer's mortgage was six months in arrears and they were prepared to go to foreclosure on the property. He excused himself and Mr. Curtis stayed on the line.

[Mr. Curtis] said that he had knowledge that IRS had not made an agreement with Mr. Barrer to repay the balance of the taxes; that they were ready to go back to another tax sale as soon as this $17,400 was paid.[17]

Based on the information furnished by Curtis, Ford, and the credit report, the Bank decided to stop payment on the cashier's check. The Bank's counsel called Barrer later that day to inform him that the check would not be honored.[18] When Curtis, to whom the IRS had turned over the check, presented it for payment the Bank refused to cash it. Barrer, therefore, did not effect the redemption of his home within the statutory period and Curtis became the owner.

### B. *Procedural History*

Barrer filed suit against the Bank in District Court to recover damages to compensate him for the loss of $94,000 equity in his home—the difference between the market value of the house and the balance due on the mortgage—that he allegedly suffered as a result of the Bank's rescission of the loan agreement. Barrer also claimed punitive damages for the embarrassment he endured and the rent he has been required to pay Curtis in order to remain in his home.

The case was referred to a magistrate for pretrial proceedings. On the Bank's motion for summary judgment, the magistrate found that Barrer did not disclose the following five material facts to the Bank: (1) that he was six months delinquent in mortgage payments, (2) that Columbia had begun foreclosure procedures, (3) that Barrer had at least an $11,000 contingent liability to the IRS in addition to his $38,000 actual liability, (4) that he had a contingent liability to IBM of approximately $5,000, and (5) that he had approximately $1,500 in unsatisfied judgments pending against him. The magistrate purported to rely on the law of innocent material misrepresentation to hold that these disclosure omissions justified WNB's rescission of the loan contract. On that basis, he granted

**17.** Deposition of Emma Carrera, J.A. 329–31.  **18.** Barrer Dep., J.A. 155.

summary judgment in favor of the Bank. This appeal followed.

## II. ANALYSIS

### A. *Standards for Summary Judgment*

A motion for summary judgment may be granted only where the record makes clear "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [19] The burden of demonstrating the absence of any genuine issue of material fact is on the movant.[20] In assessing a motion for summary judgment, the court must view all inferences to be drawn from the evidence in the light most favorable to the party opposing the motion.[21] All doubts as to the existence of a material dispute must be resolved against summary judgment.[22] If conflict appears as to a material fact, summary judgment is not proper, "unless the evidence on one or the other hand is too incredible to be accepted by reasonable minds or is without legal probative force even if true." [23]

As we demonstrate below, the magistrate failed both to apply the correct legal test for determining whether an "innocent" misrepresentation justifies the rescission of a contract and to recognize that with regard to each of the five alleged misrepresentations there exist legally probative, material issues of fact in dispute.[24] Thus, the award of summary judgment in favor of the Bank was erroneous and must be reversed.

### B. *Elements of Innocent Material Misrepresentation*

■ It is well established that misrepresentation of material facts may be the basis for the rescission of a contract, even where the misrepresentations are made innocently, without knowledge of their falsity and without fraudulent intent.[25] The rationale supporting this rule, which has its origins in equity,[26] is that, as between two innocent parties, the party making the representation should bear the loss.[27] Stated another way, the rule is based on the view that "one who has made a false statement ought not to benefit at the expense of another who has been prejudiced by relying on the statement." [28] This rule may be employed "actively," as in a suit at equity or law for rescission and restitution, or

---

**19.** FED.R.CIV.P. 56(c); *see also Kreuzer v. American Academy of Periodontology,* 735 F.2d 1479, 1495 (D.C.Cir.1984); *Bouchard v. Washington,* 514 F.2d 824, 827 (D.C.Cir.1975).

**20.** *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Kreuzer,* 735 F.2d at 1495; *Bouchard,* 514 F.2d at 827.

**21.** *See, e.g., Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608; *Kreuzer,* 735 F.2d at 1495; *Bouchard,* 514 F.2d at 827.

**22.** *See, e.g., Bouchard,* 514 F.2d at 827; *Dewey v. Clark,* 180 F.2d 766, 772 (D.C.Cir.1950).

**23.** *Dewey,* 180 F.2d at 772.

**24.** We agree with the magistrate that the fact that the Bank issued the loan in the form of a cashier's check is not significant here. Barrer is clearly suing on the contract underlying the instrument, not on the instrument itself, as is evident from the fact that he seeks consequential and punitive damages, not simply recovery of the amount of the check. Moreover, this case implicates none of the usual interests that the law of negotiable instruments is intended to protect, *e.g.,* the rights of third parties or holders in due course. "Hence the strong considerations of public policy favoring negotiability and reliability of cashier's checks are not germane." *TPO Inc. v. Federal Deposit Ins. Corp.,* 487 F.2d 131, 135 (3d Cir.1973).

**25.** *See, e.g., Lockwood v. Christakos,* 181·F.2d 805, 807 (D.C.Cir.1950); *Cousineau v. Walker,* 613 P.2d 608, 611 (Alaska 1980); *Creamer v. Helferstay,* 294 Md. 107, 116, 448 A.2d 332, 337 (1982); *First Nat'l Bank & Trust Co. v. Notte,* 97 Wis.2d 207, 220–21, 293 N.W.2d 530, 537–38 (1980); E. FARNSWORTH, CONTRACTS § 4.12, at 242 (1982); RESTATEMENT (SECOND) OF CONTRACTS § 164 and comment b (1981) (hereinafter cited as "RESTATEMENT (SECOND)").

**26.** James & Gray, *Misrepresentation—Part II,* 37 MD.L.REV. 488, 534 (1978).

**27.** *Notte,* 97 Wis.2d at 220, 293 N.W.2d at 537.

**28.** James & Gray, *supra* note 26, at 535.

"passively," as a defense to a suit for breach of contract.[29]

■ It is generally understood that four conditions must be met before a contract may be avoided for innocent misrepresentation. The recipient of the alleged misrepresentation must demonstrate that the maker made an assertion: (1) that was not in accord with the facts, (2) that was material, and (3) that was relied upon (4) justifiably by the recipient in manifesting his assent to the agreement.[30] District of Columbia law adds a fifth condition, *i.e.,* that the recipient relied to his detriment.[31]

Unfortunately, the applicable precedent does not elaborate on the meaning of these conditions. In trying to give them content, we have found that the *Restatement (Second) of Contracts ("Restatement (Second)")*[32] provides helpful guidance concerning the first four conditions.

### 1. Misrepresentation

Section 159 of the *Restatement (Second)* defines a misrepresentation as "an assertion that is not in accord with the facts."[33] Comment c explains that an "assertion must relate to something that is a fact at the time the assertion is made in order to be a misrepresentation. Such facts include past events as well as present circumstances but do not include future events." Comment d observes that a person's state of mind is a fact and that an assertion of one's opinion constitutes a misrepresentation if the state of mind is other than as asserted.

According to section 161, the only non-disclosures that may be considered assertions of fact for purposes of misrepresentation analysis[34] are non-disclosures of facts known to the maker where the maker knows that disclosure: (a) is necessary to prevent a previous assertion from being a misrepresentation or from being fraudulent or material, (b) would correct a mistake of the other party as to a basic assumption on which that party is making the contract, if non-disclosure amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing, or (c) would correct a mistake of the other party as to the contents or effect of a writing. The section also provides that where the other person is entitled to know the nondisclosed facts because a relation of trust and confidence exists between the parties, non-disclosure is equivalent to an assertion of facts.

### 2. Materiality

In section 162, comment c, the *Restatement (Second)* explains that a misrepresen-

---

**29.** See, e.g., James & Gray, *Misrepresentation—Part I,* 37 Md.L.Rev. 286, 315 (1977).

In some jurisdictions, including the District of Columbia, recipients of innocent material misrepresentations may, under certain circumstances, choose between the mutually exclusive options of rescission of the contract accompanied by restoration of the parties to the *status quo ante,* and a cause of action for damages in tort. Cases and commentary noting that recipients of material misrepresentations may elect to sue either for rescission or for tort damages include *Dresser v. Sunderland Apartment Tenants Ass'n,* 465 A.2d 835, 840 (D.C.1983); *Kent Homes, Inc. v. Frankel,* 128 A.2d 444, 445 (D.C. 1957); James & Gray, *supra,* at 315–22; James & Gray, *supra* note 26, at 527–43; Restatement (Second), *supra* note 25, at 425. In this jurisdiction, the following cases suggest that, under certain circumstances, tort liability for honest material misrepresentation may lie: *Isen v. Calvert Corp.,* 379 F.2d 126 (D.C.Cir.1967); *Darnell v. Darnell,* 200 F.2d 747 (D.C.Cir.1952); *Stein v. Treger,* 182 F.2d 696 (D.C.Cir.1950). *See generally* Hill, *Damages for Innocent Misrepresenta-* tion, 73 Colum.L.Rev. 677, 747 (1973) (concluding that the jurisdictions that recognize tort liability for innocent misrepresentations remain a minority).

**30.** See, e.g., *Lockwood,* 181 F.2d at 807; *Cousineau,* 613 P.2d at 612; *Notte,* 97 Wis.2d at 222, 293 N.W.2d at 538; E. Farnsworth, *supra* note 25, § 4.10, at 236; Restatement (Second), *supra* note 25, § 164(1) and comment a.

**31.** *Lockwood,* 181 F.2d at 807; *see also* E. Farnsworth, *supra* note 25, § 4.13, at 245–46.

**32.** *See* note 25 *supra.*

**33.** *Accord Greene v. Gibraltar Mortgage Inv. Corp.,* 488 F.Supp. 177, 179 (D.D.C.1980); *Notte,* 97 Wis.2d at 222, 293 N.W.2d 538.

**34.** The *Restatement (Second)* distinguishes between nondisclosures, § 161 and comment a, and actions that are equivalent to assertions (concealment), § 160.

tation is material "if it would be likely to induce a reasonable person to manifest his assent." The court in *Cousineau v. Walker* elaborated on the materiality requirement, noting that it is a mixed question of law and fact that asks whether the assertion is one to which a reasonable person might be expected to attach importance in making a choice of action.[35] A material fact is one that could reasonably be expected to influence a person's judgment or conduct concerning a transaction.[36]

The justification for the materiality requirement is that it is believed to encourage stability in contract relations. It prevents parties who become disappointed at the outcome of their bargain from seizing upon any insignificant discrepancy to void the contract.[37]

### 3. *Reliance*

Section 167 requires that the misrepresentation be causally related to the recipient's decision to agree to the contract— that it have been an inducement to agree. Inducement, as comment a explains, is shown through actual reliance. Comment a goes on to state that this reliance need not, however, be the sole or predominant factor influencing the recipient's decision. Comment b indicates that circumstantial evidence is often important in determining whether there was actual reliance.[38]

### 4. *Justifiability of Reliance*

Section 172 of the *Restatement (Second)* provides that a recipient's fault in not

knowing or discovering the facts before making the contract does not make his reliance unjustified unless it amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.[39]

While section 169 suggests that reliance on an assertion of opinion often is not justified, section 168(2) and the accompanying comment d make clear that in some situations the recipient may reasonably understand a statement of opinion to be more than an assertion as to the maker's state of mind. Where circumstances justify it, a statement of opinion may also be reasonably understood as carrying with it an assertion that the maker knows facts sufficient to justify him in forming it.[40]

### 5. *Detriment*

Because the *Restatement (Second)* does not require a showing of detriment for rescission, it does not define it.[41] We think that, in the innocent material misrepresentation context, a recipient is appropriately considered to have relied to his detriment where he receives something that is less valuable or different in some significant respect from that which he reasonably expected.[42]

### C. *Application of Legal Standards*

■ Application of the foregoing principles to the facts of this case requires that the case be remanded for trial. The magistrate tested Barrer's alleged misrepresen-

---

**35.** 613 P.2d at 613.

**36.** *Id.; see also Homelite v. Trywilk Realty Co.,* 272 F.2d 688, 691 (4th Cir.1959).

**37.** *Cousineau,* 613 P.2d at 613; *see also* James & Gray, *supra* note 26, at 500.

**38.** In *Cousineau,* for example, the court relied on circumstantial evidence to find reliance. 613 P.2d at 612–13.

**39.** *Accord Notte,* 97 Wis.2d at 224, 293 N.W.2d at 539.

**40.** *See, e.g., Johnson v. Healy,* 176 Conn. 97, 101, 405 A.2d 54, 57 (1978) (finding that assertion by

builder that there was "nothing wrong" with the house could reasonably have been understood by the buyer to be an assertion that the builder had sufficient factual information to justify his opinion and finding that, in context, this assertion could reasonably have induced reliance); *see also* James & Gray, *supra* note 26, at 489–93 (discussing when opinions warrant reliance).

**41.** *See* section 164, comment c ("In general, the recipient of a misrepresentation need not show that he has actually been harmed by relying on it in order to avoid the contract.").

**42.** *See, e.g.,* E. FARNSWORTH, *supra* note 25, § 4.13, at 245–46; McCleary, *Damage as Requisite to Rescission for Misrepresentation: II,* 36 MICH.L. REV. 227, 227–44 (1937).

tations against only two of the five elements necessary for rescission—he asked only if the representations were in accord with the facts and if they were material. In making this inquiry, the magistrate failed to consider the legal distinctions between assertions of fact and nondisclosure and between assertions of fact and statements of opinion. He neglected to investigate whether the Bank actually relied on the representations in deciding to make the loan; whether that reliance, if it existed, was justifiable; and whether the Bank relied to its detriment. Furthermore, the magistrate incorrectly concluded that there were no legally probative, material issues of fact in dispute.

### 1. Elements the Magistrate Failed to Consider

Initially, assuming for a moment that Barrer actually "misrepresented" certain facts, the materiality of the representations is hardly obvious. After deciding which representations meet the legal definition of misrepresentation, the trial court must determine with regard to each individual misrepresentation whether it was "likely to induce a reasonable [bank] to manifest [its] assent"[43] to the loan agreement. If no single misrepresentation is found to be material, the court may consider, after ascertaining the assertions upon which WNB justifiably relied, whether those assertions are material when taken together.

All five alleged "misrepresentations" also raise serious factual questions as to whether the Bank actually and justifiably relied on them. Womack's expressed sympathy for Barrer combined with the fact that the loan was issued in a very short time, without either a credit check, which was obtainable in minutes, or an inquiry into the status of Barrer's mortgage, and the fact that the loan was withdrawn only when the Bank was placed in an embarrassing position by the tax sale purchaser—all these circumstances could suggest that the Bank was not very interested in the particulars of Barrer's financial condi-

tion. Indeed, it was clear from the loan application that Barrer did admit that he was experiencing financial difficulties, yet WNB chose to make no further inquiry into the details of these problems. These facts could be construed to show that Womack's sympathy for Barrer's predicament was the real inducement for the loan. If the trial court finds that the Bank actually relied on Barrer's alleged "misrepresentations," it nonetheless must proceed to decide whether that reliance was justified.

The trial court must also determine whether the Bank's reliance on Barrer's alleged "misrepresentations" caused it any detriment. Did WNB receive as its benefit of the bargain something less valuable or significantly different from what it reasonably expected? In addition, the trial court should consider whether the subordination agreement, in combination with the right to a security interest in Barrer's house granted by the collateral note, fully satisfied the Bank's expectations.

The magistrate also made individual errors with respect to the five representations. These errors are outlined below.

### 2. Delinquency in Mortgage Payments

Barrer and Womack disagree over whether he told her that he "thought" he was two months behind in his mortgage payments or whether he said that he was current. Because this case is before us on appeal from the magistrate's grant of summary judgment for the Bank, we must accept Barrer's statement of the facts. The Bank argues that even if Barrer's version is accepted, a misrepresentation still occurred because Barrer was actually six months behind. The Bank's position is not necessarily correct.

■ Barrer's statement that he "thought" he was in arrears by two months initially raises the factual question whether he made any misrepresentation. On the surface, the fact asserted by Barrer was his state of mind—what he thought. No finding was made below that Barrer's

---

**43.** Restatement (Second), *supra* note 25, § 162    comment c.

state of mind was other than what he declared. On remand, before it may determine that this statement constituted a misrepresentation, the court must find either that Barrer misstated his thoughts, in accordance with the rule laid out in section 159, comment d of the *Restatement (Second),*[44] or that Barrer's statement could reasonably have been understood as carrying with it an assertion that Barrer knew sufficient facts that justified him in forming his opinion, in accordance with section 168(2).[45]

When evaluating the materiality of this particular representation, the court should keep in mind the concession made by WNB's counsel at oral argument—that by itself this representation might not be sufficient to justify summary judgment.

### 3. *Failure to Disclose Mortgage Foreclosure Proceedings*

Although the Bank evidently did not ask Barrer directly whether his mortgage was being foreclosed upon, it contends that he had an obligation to volunteer that information and that his failure to do so is tantamount to a misrepresentation. Barrer argues that he had no duty to reveal the existence of the foreclosure proceedings because he did not know about them. The Bank maintains that he must have known, because before Barrer applied for the loan his teen-age daughter signed for a certified letter from Columbia notifying him of the foreclosure.

■ The magistrate erred in finding on summary judgment that this non-disclosure is equivalent to a misrepresentation. The *Restatement (Second)* provides that a non-disclosure may be considered an assertion

of fact for purposes of misrepresentation analysis only if the non-disclosed fact is *known*[46] to the maker and if certain other conditions are met. Because there exists a material issue of fact as to whether Barrer knew that Columbia had begun to foreclose, summary judgment was inappropriate.

### 4. *$11,000 Contingent Liability*

■ The magistrate also erred in finding on summary judgment that Barrer's alleged failure to list as a personal contingent liability an $11,000 tax debt owed to the IRS by his corporation constituted a misrepresentation. First, summary judgment is precluded by the existence of a factual dispute over whether this $11,000 was included in the $38,000 tax liability that Barrer did list. Barrer seems to contend that at least some of this amount was included in the $38,000 figure;[47] the Bank seems to dispute this contention. Second, there is a mixed question of law and fact as to whether the IRS had, at the time of the loan application, taken any action to assert the $11,000 tax debt owed by Today News Service, Inc., against Barrer personally and, if not, whether the corporation's liability may be considered Barrer's contingent liability. If the $11,000 tax debt could not at that time have been considered Barrer's liability, his failure to list such a debt was not a misrepresentation.[48]

### 5. *$5,300 Debt Owed to IBM*

■ The magistrate found that Barrer's failure to reveal as a personal liability a $5,300 debt owed to IBM for equipment purchased by his wife was a misrepresentation. We disagree as a matter of law.

---

**44.** *See* note 33 *supra* and accompanying text.

**45.** *See* note 40 *supra* and accompanying text.

**46.** We do not consider the presumption of knowledge of the truth about one's own business or property that this court has employed in actions for damages caused by material misrepresentations, *see Isen,* 379 F.2d at 129–30; *Darnell,* 200 F.2d at 748, to be pertinent to *non-disclosures.* Where non-disclosure is alleged to constitute a misrepresentation, actual knowl-

edge of the non-disclosed fact must be demonstrated.

**47.** *See, e.g.,* Brief for Appellant at 11–12, J.A. 587–88.

**48.** According to the *Restatement (Second),* a misrepresentation includes past and present events, but not future ones. *See* § 159 comment c; *see also* note 33 *supra* and accompanying text.

Although Barrer asked the probate court handling his wife's estate to charge him with the debt, the court refused, ruling that the debt was hers alone. Contrary to the Bank's protestations, it makes no difference to the determination whether a misrepresentation occurred that Barrer asked the probate court to charge him with the debt before, and the court refused after, Barrer submitted the loan application. A misrepresentation is "an assertion that is not in accord with the facts."[49] The fact is that a court decided that this debt *never* legally belonged to Barrer. Barrer's thoughts or wishes on the matter are irrelevant. He made no legal misrepresentation to the Bank on this subject.

### 6. *$1,500 in Judgments*

■ Finally, the magistrate determined that Barrer's failure to list $1,500 in judgments that were outstanding against him constituted a misrepresentation. This issue should not have been resolved on summary judgment. Barrer disclosed on the loan application that he was a defendant in some lawsuits.[50] Furthermore, in his deposition he stated that he had informed Womack that he owed some small judgments arising out of these suits and that he expected his health insurance to cover most of them.[51] Accepting Barrer's version of the facts, as we must in reviewing a grant of summary judgment, he revealed both his defendant status and the existence of judgments against him. It is true that he did not list them on the application form. Because, however, Barrer contends that he

adequately disclosed these debts in connection with the question concerning lawsuits and in his discussion with Womack, there exists a dispute over whether he actually revealed these debts; consequently the magistrate should not have resolved this issue on summary judgment. On remand, two factual questions must be decided. First, what information concerning these judgments did Barrer give to Womack? Second, was that information sufficient to give the Bank notice of them?[52] If it was sufficient, then Barrer made no misrepresentation.

### III. CONCLUSION

The magistrate both failed to utilize the correct legal test for determining when an innocent material misrepresentation permits the rescission of a contract and to recognize that this case presents disputed material issues of fact that render summary judgment inappropriate.[53] We reverse and remand for further proceedings consistent with this opinion.

---

**49.** RESTATEMENT (SECOND), *supra* note 25, § 159.

**50.** J.A. 576.

**51.** Barrer Dep., J.A. 103, 118–20.

**52.** We note that, as counsel for the Bank conceded at oral argument, Barrer was not represented by an attorney when he filled out the loan application or when he discussed it with Womack. In considering whether adequate notice was given, it should be kept in mind that a layman might not appreciate the distinction urged by the bank between being a defendant in an ongoing lawsuit and having a judgment entered against one. The substance of the infor-

mation concerning the judgment debts should therefore be given greater weight than its form.

**53.** We wish to emphasize that in this opinion we are not holding banks to a new, high level of responsibility for checking the truthfulness of loan applications before we will furnish them ordinary contract law protection. We merely decide here that the magistrate did not apply the correct legal standard and that there exist disputes over material facts that render the case inappropriate for disposition on summary judgment.