**In the Matter of the Arbitration Between U.S. OFFSHORE, INC., Petitioner,**

**and**

**SEABULK OFFSHORE, LTD., Respondent.**

**No. 90 Civ. 6209 (MBM).**

United States District Court, S.D. New York.

Dec. 5, 1990.

Bruce A. McAllister, Todd B. Sollis, Mishkin, O'Neil & McAllister, New York City, for petitioner.

Eric E. Lenck, Freehill, Hogan & Mahar, New York City, Michael Joseph, Alex Blanton, Joseph O. Click, Dyer, Ellis, Joseph & Mills, Washington, D.C., for respondent.

OPINION AND ORDER

MUKASEY, District Judge.

This case comes before the court on cross-motions relating to a September 7, 1990 arbitration award in petitioner's favor by a majority of a panel of three arbitrators sitting in New York, pursuant to the Arbitration Rules of the Society of Maritime Arbitrators, Inc. The award dealt with rights under a contract whereby petitioner was to manage offshore supply vessels that respondent purchased. Petitioner moves to confirm the award; respondent moves in the alternative to stay this proceeding in favor of an action it filed in the Southern District of Florida three days before petitioner filed here, or to vacate the award on any or all of three grounds: (i) the arbitrators manifestly disregarded the law; (ii) the award violates public policy; (iii) the arbitrators exceeded their authority. As set forth below, respondent's Florida action is an exercise in forum shopping and places this case well within the recognized exceptions to this Circuit's first filed rule, and the proffered bases for vacating the arbitrators' award, whether considered individually or in tandem, are meritless. Accordingly, the petition to confirm the award is granted, and the cross-motion to stay this action or vacate the award is denied. Petitioner has moved for Rule 11 sanctions, which are granted to the extent set forth below.

I.

The facts, insofar as they are relevant to this proceeding, and bearing in mind particularly that it is not a court's function to reassess arbitrators' factual findings, *Andros Compania Maritima v. Marc Rich & Co., A.G.*, 579 F.2d 691, 703 (2d Cir.1978), are as follows: In the fall of 1989, petitioner U.S. Offshore, Inc. ("USO"), through Drexel, Burnham, Lambert, Inc., brought to respondent's affiliate Hvide Shipping, Inc. a proposal whereby Hvide could exercise USO's options to buy eight offshore supply vessels, which would then be refurbished to service offshore oil drilling operations in the Gulf of Mexico. Hvide accepted the basic proposal and

formed respondent Seabulk Offshore, Ltd., a Florida limited partnership, to purchase the vessels and enter into a five-year operating agreement with USO.

The deal was closed in November 1989 under extreme time pressure because USO's principal owner and chief executive officer, J. Michael Jones, stood to lose a $1 million deposit on the vessels if the deal did not close promptly. At Hvide's request, to provide a performance incentive, J. Michael Jones became a limited partner in Seabulk. His younger brother, George Jones, was the chief operating officer of USO, which was to supervise the refurbishing of the vessels and operate them.

Soon after the closing, the relationship between the parties deteriorated. Hvide and Seabulk carped at USO's performance, although according to the arbitrators USO accomplished the refurbishment well under adverse conditions and put the vessels into service at profitable rates in December 1989 and January 1990. (Arb.Op. 4) Apparently, J. Michael Jones contributed abrasion and acrimony to the equation. Just before a particularly bitter meeting on January 11, 1990, Seabulk learned that George Jones had been convicted in 1985 of bank fraud for inflating invoices and receivables in connection with another offshore oil supply operation, a fact that J. Michael Jones had not disclosed during the hectic negotiations that preceded the closing. George Jones had received a probationary sentence. After verifying the information, Seabulk recoiled in a horror whose genuineness may be open to debate, and sent notice on January 29 that it was rescinding the deal. George Jones offered to resign from USO, but Seabulk pressed its unilateral termination and proceeded to take over operation of the vessels. USO then demanded arbitration pursuant to the operating agreement.

The arbitration was held in New York under the rules of the Society of Maritime Arbitrators. Before the hearings commenced, the arbitrators disclosed various business and personal relationships between and among themselves and both parties. Seabulk raised no objection to the panel. Thereafter, following six evidentiary sessions, principal and reply post-hearing briefs and summary oral argument, a majority of the panel found for USO in a thoughtful 23–page opinion. The majority conclusion most vigorously assailed by Seabulk is that nondisclosure of George Jones's criminal record did not justify rescission because Seabulk proved no damage from the nondisclosure, particularly in view of USO's offer to replace George Jones. The majority found that J. Michael Jones had not sought to conceal his brother's record, but simply had not disclosed it, and cited in support of this conclusion that he had proffered as a reference a person who was aware of George Jones's conviction, something he would not have done if he had been intent on concealment. Although the majority stated in one sentence that the conviction was material (Arb.Op. 14–15), its subsequent page and one-half discussion casts some doubt on whether that was in fact its conclusion, or whether it simply reached no conclusion on that issue because it believed there could be no rescission absent damages, as follows:

"In summary, it is a judgment call as to whether disclosure of George Jones' background would have squelched the transaction. Therefore, the degree of materiality and reliance on the undisclosed information, i.e., the centrality of George Jones' background in relation to the other inducing factors, remains a matter upon which the Panel differs. This disagreement is, however, without consequence regarding the final decision, since it is only one of the factors needed to sustain [Seabulk's] position. But speculation as to Hvide's likely response had it prior knowledge of the George Jones conviction leads to the ultimate irony of this arbitration: the non-disclosure, to the extent it may have been of supreme materiality to SOL, resulted in their becoming party to a transaction that has considerably enriched Hvide. That paradoxical result is a fitting introduction to a discussion of the pivotal issue governing the Panel's conclusion, that being whether the non-disclosure caused damage to [Seabulk], a fact that must be

established if [Seabulk's] action of vitiating the contract is to be sustained." (Arb.Op. 15–16)

The majority also concluded, *inter alia*, that Seabulk had purchased no security in connection with its entry into the transaction, and accordingly that the standards governing securities transactions did not apply.

The majority determined that Seabulk's unilateral termination of the contract was unjustified, and awarded USO various items of damage, adding interest and attorneys' fees.

On September 24, 1990, Seabulk and its general partner filed an action in U.S. District Court for the Southern District of Florida against USO and certain of its affiliates, charging violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 thereunder, and RICO, and seeking to vacate the arbitration award and dissolve the partnership. The action at bar was filed in this court three days later. USO's counsel has averred, and Seabulk has not denied, that as of October 17, 1990, when USO submitted its opposition to Seabulk's motion, Seabulk had served neither the summons and complaint nor the motion it said it had filed in the Florida action seeking to enjoin this action. As of the date of this opinion I have not been advised that USO has been enjoined from proceeding in this action.

## II.

■ Seabulk relies on this Circuit's well settled first filed rule to request that I stay or dismiss this action in favor of the earlier filed action in the Southern District of Florida. *Fort Howard Paper Co. v. William D. Witter, Inc.*, 787 F.2d 784, 790 (2d Cir. 1986), and cases cited therein. However, that well settled rule, ordinarily requiring the second action to yield to the first, has equally well settled exceptions when the second action may be favored by a balance of convenience or by "special circumstances," the most special of which is the institutional interest of courts in discouraging forum shopping. *Motion Picture Laboratory Technicians Local 780 v. McGregor & Werner, Inc.*, 804 F.2d 16, 19 (2d Cir.1986), and cases cited therein.

As to convenience, *McGregor & Werner* endorses the Ninth Circuit's decision in *Central Valley Typographical Union, No. 46 v. McClatchy Newspapers*, 762 F.2d 741 (9th Cir.1985) holding that the location where an arbitration was held is presumptively the convenient forum for settling the dispute. 804 F.2d at 18. Here, the arbitration was held in the Southern District of New York. Moreover, Seabulk's Florida action, brought in a jurisdiction where its headquarters are located but otherwise having no significant connection with the underlying events, and pursued in only desultory fashion if at all after it was filed, gives off the unmistakable aroma of forum shopping. For both reasons, the motion to dismiss or stay this action in favor of the earlier filed action in the Southern District of Florida is denied.

## III.

Turning to the merits of Seabulk's arguments, such as they are, respondent's main contention is that the majority arbitrators manifestly disregarded the law when they held that it was necessary for Seabulk to show damage from the failure to disclose George Jones's conviction in order to justify rescission of the operating agreement, which by its terms is governed by Florida law. Here Seabulk relies mainly on Restatement, Second, Contracts § 164(1), which provides as follows:

> "(1) If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient."

Seabulk stresses that the quoted subparagraph makes a contract voidable for either a fraudulent *or* a material misrepresentation, without more, argues that the arbitrators found George Jones's conviction to have been a material fact, and claims that Seabulk should therefore as a matter of law have been allowed to rescind the operating agreement. Because Seabulk argued this position to the arbitrators, it reasons that the majority's failure to adopt it means that they must have disregarded the law.

There are several flaws in that reasoning. First, it is doubtful if § 164 applies here at all. That section deals only with misrepresentation. This case deals with innocent nondisclosure, not with misrepresentation. Non-disclosure is governed by another section of the Restatement, as follows:

"§ 161. When Non–Disclosure Is Equivalent to an Assertion

A person's non-disclosure of a fact known to him is equivalent to an assertion that the fact does not exist in the following cases only:

(a) where he knows that disclosure of the fact is necessary to prevent some previous assertion from being a misrepresentation or from being fraudulent or material.

(b) where he knows that disclosure of the fact would correct a mistake of the other party as to a basic assumption on which that party is making the contract and if non-disclosure of the fact amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.

(c) where he knows that disclosure of the fact would correct a mistake of the other party as to the contents or effect of a writing, evidencing or embodying an agreement in whole or in part.

(d) where the other person is entitled to know the fact because of a relation of trust and confidence between them."

None of those provisions apply to this case, where the majority found that the non-disclosure was made without the kind of knowledge that would make it the equivalent of a misrepresentation and where there was no such relation of trust as is referred to in subparagraph (d). Accordingly, there was no error at all, let alone manifest error.

■ Moreover, manifest disregard of the law is a judicially created ground for overturning arbitration awards. Although its scope is uncertain, mere error or misunderstanding will not suffice:

"The error must have been obvious and capable of being readily and instantly perceived by the average person quali-fied to serve as an arbitrator. Moreover, the term 'disregard' implies that the arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it." *Merrill, Lynch, Pierce, Fenner & Smith v. Bobker*, 808 F.2d 930, 933 (2d Cir.1986). Thus, even if § 164 were held to apply to these facts, and even if Florida has adopted § 164 of the Restatement, and even if the quoted portion above is all there is to the rule, if the majority arbitrators simply made a mistake that would not be enough to void their award. Many cases were argued to the arbitrators, including *Barrer v. Women's Nat'l Bank*, 761 F.2d 752, 758–59 (D.C.Cir.1985), which applies a District of Columbia variant of § 164 requiring proof of detriment in order to justify rescission. Absent any Florida decision holding that detriment need not be proved, and none has been shown to have been cited to the arbitrators, the majority did not "disregard" any legal principle, let alone a "clearly governing" one that is "obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator.

Further, Seabulk has not cited nor has independent research disclosed any Florida decision explicitly adopting the rule articulated in § 164 of the Restatement. Thus, there was no "clearly governing" legal principle at issue. Still further, even if § 164 applied here, comment a to that section contains the following explicit caveat: "Even if the contract is voidable, exercise of the power of avoidance is subject to the limitations stated in Chapter 16 on remedies." Within Chapter 16, § 344 describes three interests of the promisee to be served by applying judicial remedies under the Restatement:

"(a) his 'expectation interest,' which is his interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed.

(b) his 'reliance interest,' which is his interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made, or

(c) his 'restitution interest,' which is his interest in having restored to him any benefit that he has conferred on the other party."

None of those interests would be served by rescission here. George Jones's offer to resign arguably put Seabulk in as good a position as it would have been in had the disclosure been made, and Seabulk could point to no loss caused to it or benefit to be restored to it. Thus, even those who drafted § 164 were aware that the remedy of avoidance was not to be applied mechanically, but only insofar as it served the purposes of Chapter 16. It would not have served those purposes here and the majority arbitrators were entirely justified in not applying it. Certainly, they disregarded no "clearly applicable" rule in so doing.

Again, comment c to § 164 provides that it is only "in general" that the recipient of a misrepresentation need not show harm, with a "but see" reference to § 165, which provides that if a contract is voidable due to misrepresentation and facts come into accord with the representation before notice is given of an intent to avoid the contract, the contract is no longer voidable absent a showing of harm from reliance. To be sure, it appears that George Jones did not offer to resign until after Seabulk gave notice of rescission, but that section is yet another indication that avoidance is a remedy to be applied only with great care.

Finally, to the extent Florida law bears at all on the availability of avoidance or rescission as a remedy even for innocent misrepresentation, let alone innocent nondisclosure, it endorses the principle that a suit for rescission in such circumstances "'is aimed at the undoing of a bargain which circumstances would render it inequitable to enforce....'" *Robson Link & Co. v. Leedy Wheeler & Co.*, 154 Fla. 596, 18 So.2d 523, 533 (1944) (quoting *Black on Rescission and Cancellation*, 2d Ed., § 102). Inasmuch as the majority found no inequity here, Seabulk having entered into a profitable contract, it was certainly not manifest disregard of the law for the majority to have refused rescission.

Seabulk's reliance in arguing for rescission under Florida law on the opinion of the Florida Supreme Court in response to a certified question from the United States Court of Appeals for the Eleventh Circuit, as reported in *Rousseff v. E.F. Hutton & Co.*, 867 F.2d 1281 (11th Cir.1989), is entirely misplaced. That case was decided under the Florida Securities and Investor Protection Act, Fla.Stat. §§ 517.301, 517.211, which apparently permits recovery even absent loss causation and has nothing to do with this case.

IV.

Seabulk's remaining arguments for overturning the award are even less substantial than its assertions based on the Restatement (Second) of Contracts and loosely related doctrines. Thus, citing extensively from securities cases having nothing to do with the facts at issue here, Seabulk confects an argument that enforcing the majority decision would violate public policy. Seabulk's position amounts to arguing that if the securities laws applied to this transaction the result might be different. Whether it would or not is irrelevant, inasmuch as the arbitrators found the securities laws did not apply to this transaction and even Seabulk does not argue seriously to the contrary.

Nor can it seriously be claimed that the arbitrators exceeded their authority by going outside the operating agreement, which contained the arbitration clause, in determining that Seabulk had profited substantially. Seabulk appears to have seized on a phrase in the decision referring to the profits Seabulk reaped from the "combined agreements, the Partnership and the Operating Agreement, which were inseparable at the transaction's inception." (op. 16) Here, Seabulk confuses what the arbitrators could examine by way of evidence, which certainly would encompass results under the two related agreements, with what agreement they could enforce. Moreover, the arbitration clause itself is broad, encompassing "all disputes, controversies, claims or litigation *arising out of or related to* this agreement...." (emphasis added) That is broad enough to cover the arbitrators' consideration of results under a related agreement.

No greater weight attaches to Seabulk's assertion that the arbitrators exceeded their authority in awarding attorneys' fees and prejudgment interest. If both parties sought attorney's fees, as was apparently the case here, then both parties agreed *pro tanto* to submit that issue to arbitration, and the arbitrators had jurisdiction to consider that issue and to award them. *Sammi Line Co., Ltd. v. Altamar Navegacion S.A.*, 605 F.Supp. 72, 73 (S.D.N.Y.1985). Despite Seabulk's oddly phrased denial that it sought attorney's fees "as such," the fact is that it sought attorney's fees; whether it sought them as part of a claim the arbitrators never reached is irrelevant.

Moreover, the authority of the arbitrators to award interest is well settled. *A/S Siljestad v. Hideca Trading, Inc.*, 678 F.2d 391, 392 (2d Cir.1982). Seabulk argues further that it was punitive for the arbitrators to specify 14% as the rate of post-award interest when they specified 11% as the rate of pre-award interest. But that claim fails as well for two reasons. First, the arbitrators did not say that the difference in rate was intended to be punitive, and that ends the inquiry into that subject. *John T. Brady & Co. v. Form–Eze Systems, Inc.*, 623 F.2d 261, 264 (2d Cir.), *cert. denied*, 449 U.S. 1062, 101 S.Ct. 786, 66 L.Ed.2d 605 (1980). Second, it is counter-intuitive to say the least that the arbitrators would have set out to punish Seabulk by imposing a post-award interest rate of 14% when that rate, and thus the punishment, could have been avoided entirely by the simple expedient of prompt payment.

### V.

The last ditch in Seabulk's array of obstacles to enforcement of the award is its request for a stay of this proceeding pursuant to the Federal Arbitration Act so that it may investigate the possibility of impropriety by the arbitrators in rendering the award. The statute permits a court in the district where an award was made to vacate an award "procured by corruption, fraud, or undue means," or "[w]here there was evident partiality or corruption in the arbitrators ..." or where the arbitrators engaged in other prejudicial misconduct. 9 U.S.C. § 10(a)-(c). Seabulk acknowledges that it was aware of various relationships among the arbitrators, and between certain of the arbitrators and USO, and that a party may not withhold objection to the panel based on relationships of which that party is aware before and during the arbitration, and then object later when the decision is adverse. *Cook Industries, Inc. v. C. Itoh & Co. (America) Inc.*, 449 F.2d 106, 107–08 (2d Cir.1971), *cert. denied*, 405 U.S. 921, 92 S.Ct. 957, 30 L.Ed.2d 792 (1972). Rather, Seabulk argues that the majority's "bizarre opinion" raises the inference of undisclosed arbitral treachery. (Seabulk Reply Mem. p. 7)

The short answer to this breathtaking argument, which amounts to saying that anyone who does not agree with Seabulk must be corrupt, is that there is nothing "bizarre" about the majority opinion other than Seabulk's stubborn refusal to accept it. Accordingly, the request for a stay is denied.

### VI.

■ USO has moved for sanctions under Fed.R.Civ.P. 11, and seeks an award of attorney's fees incurred to rebut the meritless arguments advanced by Seabulk. Such sanctions are to be imposed "when it appears that a pleading has been interposed for any improper purpose, *or where*, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law." *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir.1985) (emphasis in original), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). It appears in this case that both bases exist for imposing sanctions. Seabulk's arguments here appear to have been motivated by a desire to forestall complying with the award, a problem courts have encountered before in dealing with litigants who lose in arbitrations, *Marc Rich & Co., supra*, 579 F.2d at 704, and its arguments in the main are not warranted by existing law or a good faith argument to extend, modify or reverse existing law. The sole exception is

its argument based on the first filed rule in the Circuit, which was at least colorable.

Accordingly, upon submission of an application based on contemporaneous time records, USO will recover the reasonable attorney's fees incurred in responding to the arguments discussed above, other than Seabulk's argument for applying the first filed rule to dismiss or stay this action based on its earlier action in the Southern District of Florida.

\* \* \*

For the reasons set forth above, petitioner's motion to confirm the award is granted, its motion for Rule 11 sanctions is granted to the extent set forth above, and respondent's motions to vacate the award and to stay or dismiss this action are denied. USO will submit its proof as to the Rule 11 award along with a proposed judgment by December 14, 1990; Seabulk will submit its opposition to such proof and its counter-proposed judgment, if any, by December 28, 1990.