2. This court has jurisdiction pursuant to section 502 of ERISA, 29 U.S.C. § 1132.

3. There is no evidence that there were any misrepresentations made to the plaintiff by the defendant.

4. It is clear under ERISA that Monsanto, like any other employer, may act in a dual role as plan sponsor and as administrator of an employee benefit plan. 29 U.S.C. § 1108(c)(3).

■ 5. The court finds nothing in ERISA requiring disclosure to the plaintiff in advance of actual implementation of the plan. A plan administrator's duties with respect to providing information to plan participants are set out in 29 U.S.C. §§ 1102, 1104, and 1105 of ERISA. Nothing in these sections requires advance disclosure to employees of deliberations on the possible adoption of new benefits. *See also Lehner v. Crane Co.,* 448 F.Supp. 1127, 1130–31 (E.D.Pa.1978); *Molumby v. Shapleigh Hardware Co.,* 395 S.W.2d 221, 227 (Mo.Ct.App.1965).

■ 6. The common law of fiduciary duties is incorporated into ERISA. Even under the common law, the duty of a trustee or fiduciary to provide information to a beneficiary is limited.

■ 7. This court finds that on July 1, 1982, no plan or formulation for an early retirement plan existed at Monsanto. Such a plan as was later adopted was still in the formative stages with no certainty of implementation. Any further disclosure would have been a disservice to Monsanto employees.

8. Plaintiff has failed to prove that Monsanto misled him with respect to the status of deliberations concerning the adoption of the retirement plan, or that Monsanto had a duty to make disclosures to him concerning the status of those deliberations.

9. Accordingly, plaintiff is not entitled to the relief prayed for and judgment will be entered for the defendant, with costs taxed against the plaintiff.

**FLEET NATIONAL BANK, Plaintiff,**

v.

**EXPORT–IMPORT BANK OF THE UNITED STATES and Foreign Credit Insurance Corporation, Defendants.**

**Civ. A. No. 83–2693.**

United States District Court, District of Columbia.

June 25, 1985.

Robert J. Hickey, Barbara Urquhart, Washington, D.C., for plaintiff.

Henry A. Hubschman, Richard H. Wyron, Fried, Frank, Harris, Schrieber &

Kampelman, Delilah Brummet, Deborah Kasper, Dept. of Justice, Patricia L. Maskell, Export-Import Bank of the U.S., Washington, D.C., for defendants.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

The above-captioned case arises out of the refusal of the defendants to pay various claims submitted by plaintiff under export credit insurance policies issued by the defendant Foreign Credit Insurance Association ("FCIA") on behalf of the defendant Export-Import Bank of the United States ("Eximbank") and other member companies. The Court presently has before it a plethora of motions and accompanying memoranda of varying degrees of merit and significance. These matters will be considered seriatim beginning with the parties' cross-motions for summary judgment.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The insurance policies underlying the claims in the action were issued to Fleet National Bank ("Fleet") by FCIA[1] on behalf of Eximbank[2] and FCIA's member insurance companies. Fleet obtained the policies to insure against nonpayment of loans extended by Fleet to certain Guatemalan buyers for the purchase of agricultural equipment. Simply stated, the policies provide that in the event of non-payment, FCIA will make payment to the insured (Fleet) and, through subrogation, seek recovery against the foreign buyer. In each of the five counts[3] in the present case, FCIA refused payment under the policies because of Fleet's alleged noncompliance with the terms and conditions of recovery under the insurance contract. Defendants' arguments for summary judgment may be considered in three steps: 1) the effect of the contractual period of limitation; 2) the requirement of "shipment" as a condition precedent to coverage; and 3) the requirement that the insured maintain a policy of hull insurance as a condition precedent to coverage.

### 1. The Contractual Period of Limitation

The "Medium Term-Comprehensive Export Credit Insurance Policy"[4] issued to Fleet by FCIA sets forth in detail the procedural requirements and limitations for filing a claim.

Article VI of the policy provides that proof of loss forms must be submitted to the company within "eight months from the date of default." Article IX provides that no civil action shall be commenced until ninety (90) days from the filing of the proof of loss forms. Article IX also states that:

> No action shall lie against the Insurers or any of them unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this policy, nor until 90 days after the required proofs of loss have been filed with the Insurers, nor *at all unless commenced prior to the expiration of eighteen months from the date of default.*

Medium Term-Comprehensive Export Credit Insurance Policy, Exhibit 1 to Plaintiff's Statement of Material Facts as to Which There is No Genuine Issue. ("Plaintiff's Exhibit 1")

"Default" is defined, in relevant part as "non-payment, in whole or in part, of the amount of principal or interest due on a

---

**1.** FCIA is an unincorporated association of insurance companies formed to act with Eximbank in issuing export credit insurance to United States exporters. *See* 12 U.S.C. § 635.

**2.** Eximbank, together with FCIA, provides export credit insurance to commercial banks, such as Fleet, in order to encourage the purchase of United States exports. *See* 12 U.S.C. § 635.

**3.** Each count refers to a distinct claim of loss by Fleet. Counts one through four are claims on a single loan; count five encompasses two separate loans.

**4.** These general terms are identical for each of the policies at issue.

note in accordance with the terms thereof." Article III, Medium Term-Comprehensive Export Credit Insurance Policy, Plaintiff's Exhibit 1.

The material facts relevant to the application of this contractual provision are not in dispute. Each count of the complaint alleges that a transaction occurred in which Fleet financed the sale of certain goods. Repayment of the loans was to be made in biannual installments. Set forth below are the installment numbers and the due dates as claimed by Fleet on its proof of loss form.

*Count 1* (Loan to Mr. Elias Font for purchase of 20 tractors):

| Installment Number | Due Date |
|---|---|
| 1 | 9/9/79 |
| 2 | 3/9/80 |
| 3 | 9/9/80 |
| 4 | 3/9/81 |
| 5 | 9/9/81 |
| 6 | 3/9/82 |
| 7 | 9/9/82 |
| 8 | 3/9/83 |
| 9 | 9/9/83 |
| 10 | 3/9/84 |

*See* Defendants' Exhibit 3. Fleet indicated to FCIA that Font had paid installment 1 only, and Fleet claimed reimbursement for installments 2 through 10.

*Count 2* (Loan to Mr. Elias Font for purchase of agricultural equipment):

| Installment Number | Due Date |
|---|---|
| 1 | 12/18/79 |
| 2 | 6/18/80 |
| 3 | 12/18/80 |
| 4 | 6/18/81 |
| 5 | 12/18/81 |
| 6 | 6/18/82 |
| 7 | 12/18/82 |
| 8 | 6/18/83 |
| 9 | 12/18/83 |
| 10 | 6/18/84 |

*See* Defendants' Exhibit 4. Fleet claimed for installments 2 through 10 after Font apparently paid installment 1.

*Count 3* (Loan to Mr. Elias Font for purchase of two airplanes):

| Installment Number | Due Date |
|---|---|
| 1 | 12/14/79 |
| 2 | 6/14/80 |
| 3 | 12/14/80 |
| 4 | 6/14/81 |
| 5 | 12/14/81 |
| 6 | 6/14/82 |

*See* Defendants' Exhibit 5. Fleet claimed for part of installment 2 and all of installments 3 through 6.

*Count 4* (Loan to Mr. Garcia Granados for purchase of farm equipment):

| Installment Number | Due Date |
|---|---|
| 1 | 10/10/78 |
| 2 | 4/10/79 |
| 3 | 10/10/79 |
| 4 | 4/10/80 |
| 5 | 10/10/80 |
| 6 | 4/10/81 |
| 7 | 10/10/81 |
| 8 | 4/10/82 |
| 9 | 10/10/82 |
| 10 | 4/10/83 |

*See* Defendants' Exhibit 6. Fleet claimed for installments 6 through 10 only.

*Count 5* (Loans to Mr. Guillermo Spross for purchase of Caterpillar tractor and payloader. The note for the Caterpillar payloader provided for repayment under the following schedule:

| Installment Number | Due Date |
|---|---|
| 1 | 6/1/79 |
| 2 | 12/1/79 |
| 3 | 6/1/80 |
| 4 | 12/1/80 |
| 5 | 6/1/81 |
| 6 | 12/1/81 |

*See* Defendants' Exhibit 7. The note for the Caterpillar tractor provided for repayment as follows:

| Installment Number | Due Date |
|---|---|
| 1 | 6/29/79 |
| 2 | 12/29/79 |
| 3 | 6/29/80 |
| 4 | 12/29/80 |
| 5 | 6/29/81 |
| 6 | 12/29/81 |

*See* Defendants' Exhibit 8.

This lawsuit was filed on September 13, 1983. Applying the eighteen month period of limitations to the undisputed factual record, the Court holds that any default which occurred prior to March 13, 1982 is barred.

Plaintiff has submitted in an attempt to avoid this outcome. Plaintiff argues that a single, missed installment does not constitute a default and that the limitation period does not begin to run until the final installment is in default. Given the statutory definition of default, as any "non-payment, in whole or in part," the Court must hold that any missed installment constitutes a default.

■ Plaintiff next argues that the contractual limitation for filing claims is internally inconsistent, unlawful and contrary to public policy. The Court finds these arguments completely without merit. The system of claims filing established in the policy is perfectly clear and simple in its operation. All claims must be filed with FCIA within eight months of any missed payment or other default. FCIA is then allowed a three month grace period to consider and, if necessary, examine the claim. If FCIA refuses payment, the claimant has another seven months, a total of eighteen months from the time of default, to file a civil action.

The purpose of the contractual provision is obvious: by shortening the time for the filing of claims (both judicial and administrative), FCIA increases its chances of collecting from absconding debtors. Because of the difficulties of overseas collection, such a provision is entirely reasonable. Of course, the limitations period also serves the time-honored purposes of providing repose, avoiding stale claims, and presenting the litigation within the realistic life-expectancy of the evidence. *See e.g., United States v. Kubrick,* 444 U.S. 111, 117, 100 S.Ct. 352, 356, 62 L.Ed.2d 259 (1979); *Bell v. Morrison,* 1. Pet. 351, 360, 26 U.S. 351, 360, 1 L.Ed. 174 (1828). Because the provisions are reasonable, there is no public policy conflict and the limitation may be enforced. *See United States v. Eastern Airlines, Inc.,* 366 F.2d 316 (2d Cir.1966).

■ The plaintiff also argues that defendants are estopped from enforcing the limitation or that defendants have otherwise waived their protections because defendants granted plaintiff's requests for extension of the eight month claim administrative limitations period. But, as defendants point out, the distinction between the administrative claim provision and the judicial claim limitation is clear and well understood by Fleet. In fact, Fleet counsel requested, but did not obtain, an extension of the contractual time period for filing suit, thus demonstrating both Fleet's awareness of the limitation and the absence of any waiver. *See* Defendants' Exhibit 35 (July 13, 1983 letter from Robert Hickey to Joseph Piepul, Senior Counsel, FCIA).[5] Any suggestion that an organization such as Fleet could not understand or otherwise comply with these simple contractual provisions is incredible.

Plaintiff finally suggests that the limitation provisions are: 1) unconscionable or a "contract of adhesions"; 2) unenforceable absent a showing of prejudice; 3) unenforceable where defendant "also breached" the contract. These arguments are also totally devoid of merit and do not warrant any discussion.[6]

---

**5.** The General Counsel of FCIA responded as follows:

With respect to the limitation period contained in the policy, I advised you at our June 20 meeting that FCIA refused to extend the contractual limitation period for bringing a lawsuit. I once again advise you in writing that FCIA refuses to extend the time limit for commencing litigation. Since the meeting I have reviewed the due dates for the claimed obligations and have found that the time to sue has passed for a number of installments. July 19, 1983 letter from Joseph Piepul to Robert Hickey.

**6.** Fleet's arguments concerning implied waiver and defendants' alleged inducement to ignore the limitations period, and the plaintiff's assertion that FCIA's material breach excused Fleet's compliance with the contract suggest that plain-

The evidence before the Court is undisputed: the standard contract provides that any claim or litigation must be commenced within eighteen months of default. A substantial number of the installments under the Fleet loans in question were in default *prior to the eighteen month cutoff date of* March 13, 1982. Plaintiff has presented no legally cognizable argument why defendants are not entitled to judgment on this issue. Accordingly, the Court will grant partial summary judgment for the defendants on all counts or parts thereof which were in default prior to March 13, 1982. Plaintiff's motion for partial summary judgment (Part XI) to the contrary is denied. *See* Fed.R.Civ.P. 56 (standards for granting summary judgment); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Davis v. Chevy Chase Financial Ltd.,* 667 F.2d 160, 172 (D.C.Cir.1981); *Barrer v. Womens National Bank,* 761 F.2d 752, 761 (D.C.Cir. 1985).

### 2. The "Shipment" Requirement

■ With respect to coverage for commercial credit (i.e., default), the general policy issued to Fleet provides as follows with respect to coverage for commercial credit risks:

> The Companies will indemnify the insured in United States dollars for 90% of the amount of the insured's loss arising out of the default on a note evidencing the financed portion of an *insured transaction,* which loss is caused by the occurrence, *after shipment,* of:
>
> 1.  insolvency of the buyer; or
> 2.  failure of the buyer to pay the insured within six months after the due date of payment the amount due on a note for products delivered to and accepted by the buyer.
>
> . . . .

tiff might not be familiar with Article XI.1 of the policy which provides that:

> Failure by the insured to comply with any term or condition of this policy shall not be deemed to have been excused or accepted by the Insurers unless the same is specifically so excused or accepted by the Insurers in writing.

Defendants' Exhibit 1, Article II.A (emphasis added).

The policies define an "insured transaction" as follows:

> As used in this policy:
>
> A.  "insured transaction" means a sale or sales approved by the Insurers on the conditions specified in the Transaction Endorsement; provided the products sold are:
>
> 1.  *shipped from the United States during the policy period specified in the declarations;* and
> 2.  produced or manufactured in the United States.
>
> . . . .

Defendants' Exhibit 1, Article III.A (emphasis added).

Based on these provisions, defendants argue that shipment is a condition precedent to coverage under the policy. Without shipment, there is no "insured transaction," and hence no coverage.[7] This reading of the contract has considerable appeal. Eximbank and FCIA insure financing for United States international trade; in the absence of *shipment* of goods, their insured lenders would be making loans that do not encourage Eximbank and FCIA's institutional goals of facilitating export of United States goods.

Plaintiff characterizes this shipment issue as a question of "third party fraud"; Fleet also refuses to acquiesce in the assertion that no shipment occurred. However, Fleet argues that if shipment did not in fact occur, then Fleet was the victim of third party shipping companies and freight forwarders who supplied Fleet with forged invoices and bills of lading. According to Fleet, the contract should not be interpreted so that the lender is penalized because of third party fraud.[8]

7.  This argument refers to Counts I, II and IV.

8.  In the interests of clarity, the Court notes that defendants have not alleged—and need not prove—any "fraud" in the transactions. Their defense is contractual: according to defendants, an insured transaction never took place. Thus, plaintiff's arguments that assume the necessity

Although defendant appears to hold the higher legal ground, the Court cannot, at this time, rule on this issue. Despite the extensive documentary evidence and deposition excerpts before the Court, there exist at present genuine issues of material fact regarding the authenticity of the shipping documents and the ultimate issue of whether the shipments actually occurred.

Defendants have put forth a considerable amount of evidence suggesting that the shipping documents submitted by Fleet are forgeries. Defendants' Statement of Material Facts ¶¶ 4–7. Plaintiff, on the other hand, has come forward with evidence to contest defendants' position. *See* Plaintiff's Statement of Material Facts, ¶¶ 40–43. While plaintiff's evidence is considerably weaker, it is enough to raise a doubt and place the facts at issue. In this situation, the Court cannot weigh the evidence but must deny summary judgment when a genuine issue of material fact is presented. *See, e.g., Barrer v. Women's National Bank,* 761 F.2d 752, 756 (D.C.Cir., 1985). Even if some documents are fraudulent, the Court cannot determine from the paper record that no shipment of the goods in question ever occurred. Plaintiff and defendants are entitled to an opportunity to present evidence on the shipment issue at trial. Accordingly, defendants' motion for summary judgment on this issue is denied. Parts I, II and III of plaintiff's motion for partial summary judgment are also denied.[9]

### 3. The Hull Insurance Requirement

■ Count three involves a claim by Fleet for recovery of a loan to a Guatemalan buyer for the purchase of two crop-dusting airplanes. In addition to the general terms of the policy, the transaction endorsement provides for a special condition of coverage. This "Hull Insurance" clause provides:

> Such insurance as is afforded by the policy is conditioned upon all risks hull insurance being obtained and maintained in an amount equal to the unpaid balance of the note, payable to the insured in United States dollars in the United States.

At Fleet's request, FCIA later amended the requirement, to permit the hull insurance to be payable in a currency other than United States' dollars. FCIA documented this amendment by sending Fleet the following telex:

> Hull insurance may be denominated in currency other than U.S. dollars. Requirement of FCIA is that hull insurance be obtained. No need to amend policy.

It is undisputed that the hull insurance policies were never payable to Fleet but were instead obtained and made payable to Fleet's "agent," Bolivar International Merchant Bank. Plaintiff's Exhibit 43. Moreover, the hull insurance expired on June 4, 1980,[10] after only one of six installments

---

of proving fraud or that turn on plaintiff's "knowledge of the fraud" are irrelevant. Contrary to plaintiff's assertion, the essential question turns on interpretation of the terms "insured transaction" and "shipped" in the insurance contract, not on the "burden of proving any alleged fraud."

**9.** As to Parts I and II, *see supra* fn. 8. Plaintiff may raise all or part of these issues at trial, pending a final ruling on relevance. With respect to Part III, the Court holds that plaintiff has demonstrated no set of facts that would entitle it to estop defendants from raising any issue or defense at trial. Nor does plaintiff cite any case law or statutory authority that supports the plaintiff's "belie[f] that defendants should be estopped from asserting any defense to payment ... as to which plaintiff was not initially informed." Plaintiff's Memorandum in Support of Partial Summary Judgment at 10.

**10.** This information on the expiration of the hull insurance was finally provided in response to defendants' discovery requests in this suit.

Fleet originally (on July 28, 1983) submitted to FCIA what it alleged to be the cover pages of the hull insurance policies. At that time, Fleet did not disclose that the insurance had expired over three years ago while the balance of the note remained unpaid. When FCIA eventually learned, through discovery, that the insurance had expired, it raised this issue as a defense.

In light of Fleet's misleading communications in the course of the claims process, it is difficult for the Court to take seriously Fleet's claim that the hull insurance provisions are not material or that enforcement of the provisions would be inequitable. Fleet's concealment of the expiration of the hull insurance contract seems contrary to its current position that the absence of hull insurance is irrelevant this litigation.

was due. Plaintiff's Exhibit 43. Obviously, Fleet did not have "hull insurance ... maintained in an amount equal to the unpaid balance of the note...."

The insurance contract between Fleet and FCIA clearly states that the "insurance ... afforded by the policy is *conditioned* upon ... hull insurance" (emphasis added). In light of this language, it is difficult to escape defendants' conclusion that maintenance of the insurance is a condition precedent to coverage under the insurance contract.

There are sound policy reasons for Eximbank and FCIA to adopt such contractual requirements. Obviously, the hull insurance offers extra security to both the lender and FCIA, as subrogee. In the case of machinery such as aircraft, the insurance policy strengthens FCIA's subrogation position by providing a means of economic recovery where the condition of the aircraft precludes complete recovery through physical collection and resale. Given the policy language and the undisputed failure of Fleet to comply with the terms of the policy, the Court will grant defendants' motion for summary judgment on Count 3 of the Complaint.

Plaintiff has made several arguments in opposition, none of which deserve lengthy discussion.

First, plaintiff claims that the amendment by telex changed the requirement that insurance be "obtained and maintained" to a requirement that the insurance simply be "obtained" (and presumably not "maintained"). The Court agrees with the defendants' characterization of this argument as "illogical and unreasonable."

Second, plaintiff claims that the hull insurance requirement was not a material element of the contract and that a breach by plaintiff does not justify defendants' total nonperformance. Given the valid purpose of hull insurance and the fact that the FCIA contract specifically states that hull insurance is a *condition* of coverage, this argument is similarly unpersuasive.

Third, plaintiff argues that the failure to obtain hull, insurance is FCIA's "fault" because the telex requiring that hull insurance be "obtained" was misleading. Plaintiff also asserts, without factual foundation in the record, that FCIA "was certainly informed" about Fleet's peculiar interpretation of the hull insurance requirement, and that FCIA should have "warned" Fleet that something was amiss. As noted previously, plaintiff's proposed interpretation of the hull insurance requirement and subsequent telex are so farfetched, that plaintiff could not have reasonably interpreted it as it now argues.[11]

Finally, plaintiff asserts that "to its knowledge" neither aircraft has sustained any damage which would be covered by hull insurance. Thus, any failure on its part to obtain the insurance has resulted in "limited harm" to the defendants. This "no harm, no foul" reasoning might be appropriate in a tort action, but it is unappealing in the instant case. As noted previously, the term "condition" of coverage must be read in the context of a contract between these parties as meaning exactly what it says: hull insurance is a *condition* of coverage. Also, this argument might be somewhat more persuasive—to the defendants, at least—if the plaintiff were able to make a more affirmative representation that the aircraft were, in fact, available and in good condition. Plaintiff's claim that the planes have suffered "no damage except as caused by ordinary deterioration resulting from exposure to weather [for six years] and disuse" is less than reassuring. In light of the Court's ruling on the meaning of the "condition of coverage" language, the actual condition of the aircraft is irrelevant to this litigation.

Thus, the Court will thus grant defendants' motion for summary judgment as to

---

11. The Court takes notice of the fact that Fleet is a substantial and reputable financial organization. Fleet is undoubtedly represented and managed by persons of intelligence and legal and economic sophistication. But even if the Court's assumption is incorrect *no one* could *reasonably* interpret the hull insurance provision as plaintiff now suggests.

Count III; plaintiff's motion for summary judgment, parts VI through IX, is denied.

Given the Court's ruling on the contractual limitation period, *see supra* page 863, it is unnecessary to reach defendants' summary judgment motion with respect to Count V. That part of defendants' motion has been rendered moot since the claim underlying Count V is entirely foreclosed by the contractual period of limitations. Plaintiff's motion for summary judgment, parts IV and V, is denied for the same reason.

Plaintiff's motion for summary judgment, part X (timely filing of administrative claims) is granted as unopposed.

Plaintiff's motion for summary judgment, part XII (bad faith) is denied. *See infra* page 870.

## NON–DISPOSITIVE MOTIONS

Several non-dispositive motions are presently pending before the Court. Although some part of these motions may now be moot because of the Court's previous rulings, the Court will briefly turn to the motions that are pending.

### 1. *Grand Jury Materials*

■ Since the outset of this litigation, plaintiff has strenuously argued that Eximbank and FCIA wrongfully obtained "grand jury materials" for use in preparing their defense in this case. *See* Fed.R. Crim.P. 6(e); *United States v. Sells Engineering, Inc.,* 463 U.S. 418, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983); *United States v. Baggot,* 463 U.S. 476, 103 S.Ct. 3164, 77 L.Ed.2d 785 (1983). Defendants concede that some materials that they reviewed, specifically the records of the Magnolia Forwarding Company, had previously been subpoenaed by a federal grand jury. Defendants also concede that they spoke to certain agents of the Federal Bureau of Investigation who had knowledge of matters within the scope of the grand jury investigation.

The parties have been allowed discovery on these matters, and the Court believes that the relevant facts have been brought to light. Based on a series of orders issued by the Court, the defendants have had an opportunity to submit all of the pertinent documents as well as the affidavits of the individuals involved, including: Jerome DiFranco, Jr. (F.B.I. special agent); Charles Gaga (counsel to Eximbank); Pauline F. Hardin (Asst. U.S. Att'y., E.D.La.); Benjamin Sears (Claims Officer, Eximbank); Michael Schatzow (former Asst. U.S. Att'y., E.D.La.). All parties have had ample opportunity to comment on the factual and legal significance of these documents and affidavits. As noted, the *only* documents reviewed by defendants that can be connected in any way to the grand jury are the Magnolia business records. Although the Magnolia documents are "linked" to a grand jury proceeding, they are not in themselves "matters occurring before a grand jury." For reasons set forth below, the Court concludes that there was no violation of grand jury secrecy.

In 1981, based on information that was not obtained through the grand jury process,[12] Eximbank and FCIA began investigation of the allegedly fraudulent bills of lading and invoices. In the course of this investigation, Charles Gaga learned that certain documents of the Magnolia Forwarding Company had been subpoenaed by the grand jury and that Magnolia had not retained any copies. However, Asst. U.S. Attorney Schatzow agreed to return the previously-subpoenaed documents to Magnolia. Representatives of Magnolia and FCIA met and reviewed the documents on December 3, 1981. Magnolia subsequently returned the documents to the F.B.I.

The purpose of Rule 6(e) is to "protect from disclosure only the essence of what takes place in the grand jury room, in order or preserve the freedom and integrity of the deliberative process." *In re Grand Jury Investigation (New Jersey State Commission of Investigation),* 630 F.2d 996, 1000 (3rd Cir.1980); *see United States v. Procter & Gamble,* 356 U.S. 677, 681, 78

---

**12.** *See* Affidavit of Jerome DiFranco, Jr.; Affidavit of Charles Gaga.

S.Ct. 983, 985, 2 L.Ed.2d 1077 (1958); *SEC v. Dresser Industries, Inc.*, 628 F.2d 1368, 1382 (D.C.Cir.1980). In applying the grand jury secrecy rule, the Court must "protect the identity of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of jurors, and the like. [The rule] does not require, however, that a veil of secrecy be drawn over all matters occurring in the world that happen to be investigated by a grand jury." *Dresser Industries*, 628 F.2d at 1382 (footnote omitted).

In the context of this case, the principle of grand jury secrecy does not "forclose from all future revelation to proper authorities the same information or documents which were presented to the grand jury. The mere fact that a particular document is reviewed by a grand jury does not convert it into a 'matter occurring before the grand jury' within the meaning of 6(e)." *New Jersey State Commission*, 630 F.2d at 1000. In applying Rule 6(a) in circumstances similar to the instant case, the Third Circuit held that a state commission's request for business records previously subpoenaed by a grand jury was not governed by Rule 6(e) because mere release of subpoenaed documents does not implicate the policy of grand jury secrecy. *Id.* at 1000–01. "Documents such as the business records sought by the Commission here are created for purposes independent of grand jury investigations, and such records have many legitimate uses unrelated to the substance of the grand jury proceedings." *Id.* at 1000. In conclusion, the court quoted at length from the rule laid down by the Second Circuit in *United States v. Interstate Dress Carriers, Inc.*, 280 F.2d 52, 54 (2d Cir.1960):

> [W]hen testimony or data is sought for its own sake—for its intrinsic value in the furtherance of a lawful investigation—rather than to learn what took place before the grand jury, it is not a valid defense to disclosure that the same information was revealed to a grand jury or that the same documents had been, or

were presently being, examined by a grand jury....

This same language, from the *Dress Carriers* opinion, was quoted in this Circuit's *en banc* opinion in *SEC v. Dresser Industries, Inc.*, 628 F.2d 1368, 1382 (D.C. Cir.1980), which held that enforcement of an SEC subpoena seeking corporate documents previously subpoenaed by a grand jury did not undermine the secrecy provisions of Rule 6(e).

█ It is obvious that any review of documents subpoenaed by a grand jury might alert an intelligent reader to the subject matter of the grand jury's inquiries. But, in the words of the *Dresser* court, "the fact that a grand jury has subpoenaed documents concerning a particular matter does not insulate that matter from investigation in another forum." *Dresser*, 628 F.2d at 1383. This is so because the Magnolia documents "do not reveal what has occurred before the grand jury; they reveal only what has occurred [at Magnolia]." *Id.*

Thus, the release of the Magnolia documents themselves is not, in the circumstances of this case, a violation of grand jury secrecy that would justify the remedies sought by plaintiff. In addition to the release of the documents, plaintiff asserts that Agent DiFranco revealed other grand jury information. However, this claim (as well as other indirect insinuations of wrongdoing) is flatly contradicted by the government's affidavits. The Court has reviewed those statements and finds sufficient factual basis to hold that there is no basis for further discovery or argument on the grand jury secrecy issue.

2. *Motion to Compel Plaintiff to Supplement its Responses to Discovery*

a) *Logs and Loan Sheets:* The information requested has now been produced and identified by letters dated January 27 and June 1, 1984. Thus, the motion is denied.

b) *Insurance:* Contrary to plaintiff's suggestion, defendant does not have to "provide ... information to indicate that plaintiff ever filed a claim...." It is

equally irrelevant that "FCIA could easily have ascertained" the existence of a claim or coverage. Plaintiff must provide updated information on this relevant issue as requested by defendant. The motion is granted.

c) *Payment on Count 5:* This issue is now moot.

d) *Telephone Records:* Because of the informality of the "request" for production, it is not appropriate for a motion to compel to be considered at this time. Accordingly, it is denied.

3. *Plaintiff's Motions to Compel*

a) *Plaintiff's First Set of Discovery:* Defendants have already provided considerable amounts of discovery on this "grand jury" issue. In view of the Court's ruling on the issue, the remainder of the requested discovery is denied.

■ b) *FCIA and Eximbank's Further Responses to Plaintiff's Second and Third Sets of Discovery:* At the outset, the Court notes that the volume of paper that plaintiff has devoted to unnecessary discovery litigation is overwhelming in relation to the legal issues and dollar amounts involved. The Court has read through all four motions (totaling approximately one hundred fifty pages) in which plaintiff has sought to compel additional answers to virtually every one of its prior discovery requests.

Upon review of these motions, the Court finds both the defendants' general and specific objections to this discovery barrage well taken. A good deal of the information sought is far afield from anything remotely relevant to the issues in this case. In addition, the majority of the requests to compel simply ask for additional information where the original request was adequately answered.

In the Motion to Compel FCIA to Submit Further Responses to Plaintiff's Second Set of Discovery, for example, interrogatory number 3 asks for the identity of persons involved in all business dealings between FCIA and Eximbank from 1975 to the present. The burdensome nature, and lack of relevance, of such a request is apparent. Similarly, interrogatory number 21 seeks information on *every contract* entered into by FCIA since 1975; whether such contracts number in the hundreds or thousands, there is no conceivable reason why such a discovery request might be considered relevant in light of the scope and breadth of plaintiff's claims here.

Most of the discovery requests have been adequately answered by defendants or otherwise seek purely legal conclusions. *See e.g.,* Plaintiff's Motion to Compel FCIA to Submit Further Responses to its Second Set of Discovery (interrogatory numbers 4–7, 9–10, 12, 13–17, 19–20, 23–28). Other discovery requests seek information on issues that are now moot. *See e.g., id.* (interrogatory numbers 1–2, 8, 11 and 18).

What is especially troublesome to the Court is the amount of time and effort spent by plaintiff in seeking to compel "further responses" where defendants' initial response is obviously complete or otherwise points to a deficiency in the original request. FCIA's sixth defense, for example, is that plaintiff's complaint "fails to state a claim" under Fed.R.Civ.P. 12(b)(6). Plaintiff's interrogatory asks that defendants "state and identify the bases why" this is so and also "state all facts in support" of this defense. Plaintiff *must* be aware—at least after defendants' response points this out—that a 12(b)(6) motion is based on the facts as set forth in the complaint. Filing a motion to compel a "factual basis" for the 12(b)(6) motion is either harassment or inattention to the obvious.

There are many discovery requests that seek such obviously undiscoverable information or that otherwise seek to compel answers when a complete response has already been provided. Plaintiff has even filed a motion to clarify and supplement defendants' witness list—for both "direct and rebuttal"—at a time when plaintiff had completely failed to identify its own witnesses. *See id.* (interrogatory number 28). Other requests are so picayune that the Court is reluctantly led to conclude that there is less than a good-faith basis for those requests. Thus, the Court will, at

this time, exercise its discretion, Fed.R. Civ.P. 26(b), and decline to wade through the morass of plaintiff's discovery motions. Plaintiff's motions to compel (April 9, 1984) are denied in their entirety, without prejudice.

Because the rulings on summary judgment may have done a great deal to modify and narrow the issues for trial, the Court will not, at this time, completely deny plaintiff any further right of discovery. Plaintiff may, within twenty days of the date of this opinion, refile its motion to compel with respect to any *ten* answers to interrogatories or requests for documents against *each* defendant. *But see infra* page 870.

### 4. *Plaintiff's Motion to Strike Defenses of Defendants Pursuant to Rule 12(f)*

A motion to strike must be filed within twenty days after service of the pleading. Fed.R.Civ.P. 12(f). Accordingly, this motion is denied as untimely.

### 5. *Plaintiff's Motion For Leave to File Amended Complaint*

The primary basis for the requested amendment is plaintiff's desire to add a claim of punitive damages for defendants' aggravated "bad faith" handling of the claims. Although the Court agrees with defendants that the factual basis for such a claim is not readily apparent on the known evidence, this "factual" deficiency provides no reason to prohibit the amended complaint to be filed. If the evidence is indeed lacking, the plaintiff will be unable to prevent on a motion for directed verdict, but the Court will allow plaintiff the opportunity to muster its evidence. The motion is granted.

### 6. *Sanctions*

■ On May 18, 1984, Fleet filed a Motion for Sanctions Based on FCIA's Counsel's Failure to Permit Orderly Depositions. Other requests for sanctions have accompanied various motions and memoranda of the parties. For the reasons set forth below, the Court will, at this time, deny all requests for sanctions.

The Court had previously warned the parties that improper conduct might result in appropriate sanctions. *See* Order of April 24, 1984; *see also* Fed.R.Civ.P. 11, 16, 26, 37. The Court had hoped that this would have its usual effect of nudging the parties and counsel towards what is undoubtedly their usual standards of good faith and civility. Unfortunately, this litigation has continued to produce an unprecedented amount of unpleasant and unwarranted conflict. The Court is not merely referring to quantity—although there has been an incessant littering of the courthouse with plaintiff's unnecessary, verbose and non-meritorious motions. Unfortunately, many of those pleadings to date have been characterized by a propensity to undue length, shrill rhetoric, and an unfortunate lack of restraint.[13] Even more importantly, this focus on a time consuming battle of trivial motions seems to have caused the parties—especially the plaintiff—to occasionally lose sight of the rules of procedure and even the merits of their own positions.[14]

Nevertheless, the Court believes that sanctions are still inappropriate at this time. First, the parties, including their counsel, are sophisticated, intelligent and experienced in the litigation process. Given the high standards of representation in this case and the necessary professionalism

---

**13.** In all fairness, the Court should note that this does *not* apply to the behavior of FCIA counsel during the course of the depositions in this action. The Court finds no improprieties or other disruptive conduct that would justify Fleet's motion for sanctions. On the contrary, given Fleet's approach towards depositions, e.g., deposition of Kenneth Cavanaugh, the presence of such a motion directed towards counsel for FCIA is not without irony.

**14.** An examination of the case in its present posture causes the Court to consider whether plaintiff's counsel kept his client adequately informed during the course of this litigation. A brief review of the pleadings (approximately one hundred and twenty to date) suggests that more may be spent on attorneys fees than plaintiff can ever hope to recover under the remaining counts.

of all federal court litigators, sanctions should be, and usually are, unnecessary and superfluous in terms of modifying conduct. Second, although the parties are not by any means *in pari delicto*, there has been at least some suggestion of obdurate conduct or language on all sides. Although plaintiff has raised the lion's share of unnecessary motions and arguments, neither side is entirely without fault in escalating this litigation. Moreover, it is impossible to say at this point whether some of the arguably improper conduct was a result of zealous advocacy, malice, the "best defense is a good offense" strategy. In applying sanctions—especially against counsel—the Court believes that there is an important qualitative difference between an unnecessary escalation of hostility and premeditated harassment. The Court cannot make this distinction at the present time.[15]

Thus, although the Court has found ample evidence to justify the imposition of sanctions against the plaintiff, no order of sanctions will be entered at the present time. The parties should be aware, however, that *any* further evidence of bad faith, harassment, or other conduct subject to sanction under the Rules will result in at least the entry of attorneys fees against the offending party *and* their counsel.

An appropriate order will issue in accordance with the terms of this Opinion.

## ORDER

In accordance with the Court's Memorandum Opinion of this date, it is this 24th day of June, 1985, hereby

ORDERED that

1) Defendants' Motion for Summary Judgment is granted in part; judgment shall be, and is, entered for defendants on Counts Three and Five; further, partial judgment shall be entered on such portions of Counts One, Two and Four which seek payment for any installment which was due and owing before March 13, 1982;

2) Plaintiff's Motion for Summary Judgment, part X, is granted; plaintiff's Motion for Summary Judgment is otherwise denied;

3) Defendants' Motion to Compel Plaintiff to Supplement its Responses is granted with respect to the insurance issues and otherwise denied;

4) Plaintiff's Motions to Compel are denied; plaintiff shall have ten days from the date of this Order to refile its motion to compel with respect to any ten discovery requests directed to each defendant; no further discovery shall be taken by plaintiff without prior leave of Court;

5) Plaintiff's Motion to Strike Defenses is denied;

6) Plaintiff's Motion for Leave to File Amended Complaint is Granted;

7) All requests for sanctions are denied.

---

15. Counsel for defendants should not construe this decision to reflect adversely on their own ethical or legal standards of behavior. On the contrary, the Court has endeavored to stress the difference between sanctionable misbehavior and what might be described as "hard-nosed" litigation. In the Court's opinion, the defendants have engaged in the latter type of conduct—largely as a reaction to plaintiff's behavior.

However, on paper, it is difficult to distinguish the two types of conduct, which sometimes differ only in the intent of the parties. It is the Court's decision to avoid engaging in this unpleasant process of sorting, comparing and distinguishing the parties' behavior which has resulted in the absence of sanctions against the plaintiff. In any case, if the Court is going to err on the side of leniency towards plaintiff, the Court must also note that any criticism of defendant's behavior is perhaps overly harsh in view of the circumstances.